PETER F. WANSER, PLAINTIFF IN ERROR, v. EDWARD HOOS, DEFENDANT IN ERROR.

1. A general law, as distinguished from a special or local law, within the meaning of the constitutional provision, is a law that embraces a class of subjects or places and does not exclude any subject or place naturally belonging to such a class. The test of the generality of a law is that it shall embrace all and exclude none whose conditions and wants render such legislation equally appropriate to them as a class.

2. The principle by which general laws are distinguished from those which are either local or special applies to all legislation regulating the internal affairs of municipalities. The discretion that enters into the decision of the question whether a particular law is general or local or special is that, where the classification appears to rest on substantial grounds and the line of demarcation which separates the places included from those excluded is a matter of judgment, the resolution of the legislature will prevail unless it plainly appears that such classification is an invasion of the constitution.

3. The office of the Classification act of 1882 (*Gen. Stat.*, p. 458), by which cities were divided into classes on the basis of population, is to provide a rule of construction for the convenience of municipal legislation. Such a classification cannot be made the means of evading the constitutional interdict of local or special laws. Whether any particular statute is local or special must be determined not upon its compliance with the legislative classification, but upon whether, having regard to the character of the legislation and the limitation upon it contained in the act, the statute is or is not a general law as defined by the courts.

4. A classification on the basis of population in statutes relating to the structure, machinery and powers of municipal government is legitimate where population bears a reasonable relation to the necessities and proprieties of the various grades of municipal government, and classification in such cases being committed to the judgment of the legislature, the legislative judgment will prevail unless the classification be plainly illusory or applied illusively.

5. When a law is in terms local, satisfactory reasons must be found to exclude it from the constitutional interdict of local laws.

6. The act of March 18th, 1897, entitled "An act relating to cities of the first class in this state, and providing for the holding of municipal or charter elections therein, and regulating the terms of elective and appointive officers therein" (*Pamph. L.*, p. 43), which provides that all municipal officers in cities of the first class shall be elected in each year on the first Tuesday after the first Monday in November, which is the day fixed for the annual election of state and county officers,

and upon the same official ballots required by law for the election of state and county officers, relates neither to the structure nor to the machinery nor to the powers of municipal government. Population is not a legitimate basis of classification for the purposes of this act, and no substantial grounds appearing for discriminating between cities of the class designated in the act and other municipalities with respect to such legislation, the act is local and special and therefore within the constitutional interdict of local or special laws.

7. *Paul* v. *Gloucester County*, 21 *Vroom* 586; *Mortland* v. *Christian*, 23 *Id.* 538; *Randolph* v. *Wood*, 20 *Id.* 85; *State* v. *Borough of Clayton*, 24 *Id.* 277; *In re Haines*, 25 *Id.* 28; *Matheson* v. *Caminade*, 26 *Id.* 4; *Anderson* v. *Trenton*, 13 *Id.* 488, discussed.

On error to the Supreme Court. For opinion of the Supreme Court, see *ante p.* 35, *sub nomine Hoos* v. *O'Donnell.*

For the plaintiff in error, *Corbin & Corbin* (with whom was *John A. Blair*).

The judgments under review in the two above-entitled cases were given by the Supreme Court in *quo warranto.* The relator, Peter F. Wanser, was mayor of Jersey City, elected for five years, his term expiring on the first Monday in May, 1897. He claims that his term was extended to January 1st, 1898, by force of chapter 28 of the laws of 1897, approved March 18th, 1897 (*Pamph. L., p.* 43), which act also changes the date of the charter election from April to the general election day in November.

The relator, Samuel R. Williams, makes a similar claim as to the office of constable for the Seventh ward of Jersey City. The defendant Hoos pleads that he was elected mayor at the Jersey City charter election of April, 1897, and denies the validity of the act changing the election and extending the term of Wanser.

The defendant Leonard filed a like plea of election to the office of constable.

Demurrers were filed to both pleas, and the Supreme Court overruled them and ordered judgment final thereon for defendants.

The present controversy is over the validity of the said act

of 1897 and of the extension of terms of office under it, and the Supreme Court has held adversely to the act.

In rendering their judgment the Supreme Court were controlled by the opinions filed in April, 1897, in the case of Hoos v. O'Donnell, where the Supreme Court held in the subbranch that a *mandamus* should issue directing the city clerk of Jersey City to print ballots for a municipal election to be held April 13th, 1897, notwithstanding the act of March 18th, 1897. These opinions are therefore now under review.

I. Does the statute of 1897 in question regulate the internal affairs of towns?

The Supreme Court, in Hoos v. O'Donnell, has held that the act of 1897 is invalid because limited to first-class cities; and their doctrine is that an act fixing the date of city elections on the general election day is not valid unless it applied to all cities of all classes. It is not contended that the election day of all cities must be the same if they are not made on the general election day. The grounds of the decision are based on the proposition that on general election day the voters will be under the influence of national parties, and the reasoning has no force against a change to some other day. Charter elections in first-class cities therefore may be authorized on any election day in the year except the general election day, but cannot be held on that day. Let us examine the reasoning that has led to such a singular conclusion.

Mr. Justice Garrison says of the act in dispute: "It does not operate upon the municipality itself, it adds no feature to city government, creates no new office and enlarges no public power. To the voter alone it is addressed. * * * Whatever is to influence the mind of the voter, to determine his conduct as an elector and to find expression in his ballot, is necessarily a matter of public policy and not a question of local administration."

Mr. Justice Gummere takes a similar view, for he distinguishes decisions cited to sustain the act by saying: "The statutes there dealt with related to the structural forms of government and administration of the cities of this state on

the basis of their population," from which the only inference is that the act in question does not so relate.

Now, if these views are correct, is it not clear that this statute does not regulate the internal affairs of first-class cities at all? It if does not operate on the municipality itself, or if it does not relate to the structural form of administration of municipal government, no constitutional provision has been violated. We do not claim the benefit of this easy answer to the objections raised which this view of the Supreme Court gives us, for we think it is radically unsound. We call attention to the fact that it is admittedly by reason of this view. that the Supreme Court escapes the force of the adverse decisions of this court.

The fixing of the date and manner of a charter election is a regulation of its internal affairs, because it does operate upon the municipality itself, and does relate to the structural form of its government and administration. Popular election is made by statute a part of the structure. The late Chief Justice said in this court, in *Pell* v. *Newark,* 11 *Vroom* 552 : " I cannot think that anyone will affirm that municipal elections are not affairs of the city."

Is there not some definite meaning in the familiar statement laid down by this court so often for our guidance in cases of this class? In *McLaughlin* v. *Newark,* 28 *Vroom* 299, affirmed in 29 *Id.* 202, the statement was in these words : " The statute deals only with the structure of the municipal government—the formation of the machinery by which the affairs of the city are to be regulated ; that for such legislation the municipalities of the state may be distributed into classes constituted on the basis of their population, seems to be settled beyond dispute in this court." These figurative words, " structure " and " machinery," were introduced some years ago into our reports, and we trust we may be pardoned the suggestion that their use illustrates the truth of Sir Henry Maine's criticism upon the opinions of judges and lawyers under our common law system, that we lack a scientific terminology. But by this time they ought to have some settled

meaning, and we had best avoid changing. The "structure" is built of men, and the "machinery" is constructed of men, and they are associated like the parts of a machine to accomplish defined objects.

All government is carried on by human agency, and the laws which deal with this machinery are those which tell men where and when the work is to be done and who is to do it. When the mayor appoints to office he is operating the machinery, and laws regulating this power may be limited to first-class cities, as has often been held. When the voters elect an officer they are taking a like part in the working of the machinery of administration. It is not essential, under our constitution, that the voters shall choose any city officer; the governor might name the mayor, as he might a police justice (*Matheson* v. *Caminade*, 26 *Vroom* 5), and the mayor might name all officers, as he now does most. The same legislative power which chooses the mayor to appoint one officer chooses the voters to elect another. The change of date of an election deals with the structure of government, just as a change of the date of an appointment by the mayor; the voters in one case and the mayor in the other are directed to choose a certain officer on a certain day.

This association of elections with appointments is familiar. Examine the subjects embraced in the Jersey City charter and in every municipal charter, general or special. We have the enumeration of officers, the mode of their election, the dates for appointments and elections, the conduct of elections, the length of official terms and the dates when they begin and end, the division of duties and the various procedures. All these things constitute municipal machinery.

The regulation of an election of city officers by fixing its date and manner is a regulation of the internal affairs of the city, because it concerns the machinery of local government, and therefore, by the settled law of this court, such regulation may relate to first-class cities alone.

II. It does not impugn the validity of the act to show that it is equally appropriate to other cities.

In the two opinions in Hoos *v.* O'Donnell, which we are now criticising, the act in question was declared special because certain arguments which were stated in favor of its policy in first-class cities were thought to be equally forcible in favor of its application to other cities. But the inquiry is not whether the legislation is equally appropriate to cities of another class. Such an inquiry becomes a mere discussion of the wisdom of the law.

But first, for argument's sake, we can afford to take up the discussion and meet the Supreme Court on their own ground. Our argument, then, might be as follows :

The one advantage claimed for separate charter elections is that in such elections voters are not influenced by national party spirit. The disadvantages are numerous, among them the double expense, the lack of interest on the part of the most intelligent men and a consequent negligence in choice of candidates and in safeguards against election frauds. In first-class cities experience shows that the one advantage has failed and all the disadvantages remain. In smaller cities party spirit is usually relaxed at charter elections, but in large cities, under the influence of profitable offices existing there, parties are disciplined organizations directed by professionals, and local elections are conducted on national party lines, regardless of local interests. More is lost than gained by separate elections. Assuming the purpose of the act to be as stated by the court, here is a substantial reason for a difference between large and small towns, and the weight to be given it is a question of policy for the legislature.

Again, in large cities, the offices being more lucrative and the opportunities for unlawful gain greater, the temptation to election frauds is greater. This calls for more elaborate and expensive safeguards, and this need is recognized in our present election law, as, for instance, in provisions relating to cities of forty thousand and over. *Gen. Stat.*, *p.* 1365, §§ 361, 362, 367. Under our present election law the general election is guarded more carefully than the charter election. In view of the increased danger in first-class cities, they call

specially for increased protection. This may be afforded either by extending the costly system of registration five weeks before election to the charter election or by changing the date of the charter election to that of the general election. The legislature has seen fit to adopt the latter mode.

These, we think, are some of many fair answers to the arguments of the court on their own issue.

But we demur to the issue made up by the court because it is not raised by the act. The present counsel never advanced one of the arguments set up for refutation by Mr. Justice Gummere.

The rule now settled we understand to be that when a class of towns is properly made for a certain subject of legislation, the details on that subject are at the discretion of the legislature. Cities may be classed on the basis of population for purposes relating to the structure and machinery of government, and therefore legislation regulating the structure and machinery of the class is valid, whether equally appropriate to other cities or not.

In *State* v. *Borough of Clayton*, 24 *Vroom* 277, 281, the court said that the legislature could not only provide a complete system of government for appropriate classes of municipalities, but " may pass a series of co-related acts having a similar purpose. It would be beyond the province of this court to declare one of such laws providing for a proper class, lacking in generality because other laws relating to other classes had not been enacted." This was quoted with approval in *Green* v. *Clarke*, 27 *Id.* 62, 70. In *Road Commissioners* v. *Harrington*, 26 *Id.* 327, 328, the principle was stated concisely in these words: "A general law cannot be deemed special because it does not sweep away other general laws." And in *Johnson* v. *Asbury Park*, 29 *Id.* 607, such reasoning as is relied upon in the opinions in Hoos v. O'Donnell was rejected in these terms: "An examination of the many statutes relating to cities of the several classes, towns, townships and boroughs will disclose diversities in the power granted to these several municipal bodies, which, if

tried by the criterion proposed by counsel in this case, viz., that no reason can be given for granting certain special powers to one class of municipalities and withholding them from other classes, would operate disastrously upon the system of municipal government in force in this state. The division of municipalities into cities, towns, townships and boroughs being a classification permitted by the constitution for the purpose of local government, the powers to be conferred upon these bodies severally, which pertain to the ordinary functions of local government, must rest in legislative discretion."

The latest deliverance on the subject by this court is found in *McLaughlin* v. *Newark,* 28 *Vroom* 299; affirmed, 29 *Id.* 202, where counsel discussed the validity of an act providing that first-class cities might be divided into wards by commissioners whom the mayor should appoint, but the court declined to enter into the discussion because the question had been settled beyond dispute in favor of the act by Mortland *v.* Christian and the later cases above cited; yet the dissenting opinion by Mr. Justice Garrison (29 *Id.* 202) showed successfully that cities of the first class had not "a sole and special fitness for the imposition of this change," and the decision of the majority is therefore a decisive repudiation by this court of this test of validity, which is the same test relied upon by the Supreme Court in the two opinions in Hoos *v.* O'Donnell.

III. The court cannot impute to the legislature motives and purposes not expressed in the act.

The Supreme Court, in Hoos *v.* O'Donnell, begin by a statement of the inquiry in these terms: "Is the subject-matter of this act one that is naturally incident to mere excess of population?" We suggest the following amendment, taken from the opinion in *Paul* v. *Gloucester County* (in this court), 21 *Vroom* 592: "The extreme limit of our inquiry in this direction is, Does population bear any reasonable relation to the subject to which the legislature has applied it? Is it germane to the law?"

The court, in Hoos *v.* O'Donnell, next inquires into the

purpose of the law, and Mr. Justice Garrison states it in these terms: "The mischief was that local affairs were kept separate from state and national politics, and the remedy is to bring them together." And Mr. Justice Gummere says: "The object of this statute is to unite municipal or charter elections in cities of the first class with elections for county and state officers."

We dispute the legislative purposes thus imputed and the propriety of the tests employed.

To begin with, how does the Supreme Court know that in the separate charter elections in first-class cities local affairs have been heretofore or can be hereafter kept separate from the influence of national politics? Can the court so adjudge? And if such is the case in the opinion of the court, can the court attribute the same opinion to the legislature?

Next, how does the court know that the voting for municipal, state and national officers, on the same day and on the same ballot, will unite local affairs with national affairs in the minds of the electors; and if the court does know it, how does the court know that this particular result was the controlling purpose in the minds of the legislators?

What warrant is there in the act for the court to say: "This being beyond question both the purpose and effect of the law, it is in essence a declaration of public policy?"

It is not beyond question. The legislature might well say: "We never had any such opinion or purpose or policy. We do not admit that the present system excludes party influences in first-class city elections, and we do not admit that the change of date will increase such influences, and we have no such design. In our view an election is nothing more than the selection of certain men for certain offices. We do not fix the date as a declaration of public policy; we fix it from considerations of convenience. We assume that the voters have the sense to distinguish between candidates for state, national and local offices. We try to protect the electors against violence and fraud, but a legislative policy 'to influence the mind of the voters' is a piece of legislative

impudence of which we are not capable. We no more act on the considerations imputed to us in changing the date of an election than we do in changing the date of an appointment."

We submit that it is far outside of the province of the court to assign motives and purposes and opinions which may or may not have influenced the minds of individual members of the legislature, but which find no expression in their statutes. As Chief Justice Bryan, in the time of Edward IV., said: "The thought of man is not triable, for even the devil cannot tell what the thought of man is." Quoted in *Brogden* v. *Metropolitan Railway Co.*, 2 *App. Cas.* 666, 692.

The court in this case has made up, out of pure imagination, a purpose to strengthen party influences in local affairs; but an endless number of other purposes may be imputed with equal propriety. For example, why not impute some religious motive? "The mischief was that local elections were held in Lent; the remedy was to change them to the fall. But the Lent season is the same in all cities, therefore the act is special." Or invent a meteorological purpose? "The mischief was that the April weather was often unpropitious for elections, and the remedy was to change to early November. But the weather is the same in all cities, therefore the act is special."

Other days as well as election day have their associations. A change of date to St. Patrick's Day might imply a design to bring the electors under the influence of the votaries of that saint, and therefore, on the principles of the Supreme Court, that day could not be chosen for first-class cities, because all cities are alike entitled to share in that beneficent influence. Once admit that the court may test the act by imaginary motives and opinions and purposes, and we have turned the judicial power into a most capricious veto power.

IV. Acts relating to the structure and machinery of municipal government may be limited to first-class cities.

We think that *Mortland* v. *Christian*, 23 *Vroom* 521, must control this case. In that case, after chosen freeholders had been elected all over the state as usual at the township elec-

tions in March, an act was passed in April for first-class counties nullifying the election, extending the terms of the former freeholders until November, and directing that thereafter in first-class counties elections for freeholders should take place on the general November election day. It also changed terms and salaries and required elections to be from assembly districts.

The act was attacked on many grounds, including the change of the date of election and the extension of the term incidental thereto (23 *Vroom* 528), but its validity was sustained in this court. This decision that first-class counties are a proper class for changing the election day to that of the general election, and extending terms accordingly, is a decision that first-class cities are also a proper class for the same change. The constitution names " towns and counties."

By the statute considered in the *Haines Case*, 25 *Vroom* 6, 28, radical changes were made in the term of office and mode of appointment of officials, and the statute was held valid because it dealt with municipal machinery. In *Matheson* v. *Caminade*, 26 *Id.* 4, 8, the statute sustained gave to the governor the power to appoint police justices in second-class cities. The court rejected the test proposed that the reasons for such appointment were equally applicable to other cities, saying that it was a matter of legislative discretion. A like view was declared as to other offices in second-class cities, in *Owens* v. *Furey*, *Id.* 1, 3, where the court declared the question settled by the case In re Haines.

The reasoning of the late Chief Justice in these three cases last cited was that offices in large cities were more important than in small cities, and this was enough to justify a different mode of appointment, in the legislative discretion. This reasoning fully applies to elections ; the municipal officers being of the first importance in first-class cities, it is congruous with the situation that they be considered by themselves and be elected on an election day when other important officers are to be chosen and the special attention of voters is given to the affairs of government.

On this subject see further the cases cited in point 2, and see *Randolph* v. *Wood,* 20 *Vroom* 85, 91; affirmed, 21 *Id.* 175; *Warner* v. *Hoagland,* 22 *Id.* 62, 69, where authorities from other states are cited and a valuable discussion of the subject will be found.

V. The act applies to all first-class cities.

By the decision in *Parker* v. *Newark,* 28 *Vroom* 83, 85, it is held on the authority of prior cases in the Supreme Court that an act regulating internal affairs of cities must not exclude cities which afterwards enter the class. It is not easy to reconcile this with the case *In re Cleveland,* 23 *Id.* 188, where it was clear that no cities except existing cities could come under the act. *Pamph. L.* 1889, *p.* 205, proviso to section 33. This court may decide that it was not the design of the constitution to impose upon the legislature the prophetic duty of providing for future cities which may never exist. The present case does not call for the decision of this question. Section 1 of the act of 1897 fixes the election date for all cities which may enter the first class, and the other provisions of the act exclude no first-class city. Section 2 condenses into short compass provision for all elective officers "elected or to be elected." As to those elected heretofore, their terms shall date from the 1st day of January following their election. Thus the term of the present mayor was five years from May 1st, 1892, and by this act of 1897 it is made to "commence and date" from January 1st, 1893, being the 1st day of January following his election. The other sections make this meaning unmistakable.

For future elections in first-class cities the terms will commence on the 1st day of January next following the election. Should some city by growth pass into the class, there will be no little trouble to apply all the first-class city acts which have been held valid, but the act now in question would present little difficulty. The elective officers will hold their terms reckoned from the January 1st following their election, whenever that was. The terms of appointed officers are not affected by this act in question except by the provisions of section 4,

which is meant to provide for the gap between May and November; but this was an unnecessary section, for the present law provides against an interregnum. All officers of the city hold office until their successors' are chosen and qualify. *Pamph. L.* 1881, *p.* 47; *Stilsing* v. *Davis*, 16 *Vroom* 390; *Brown* v. *Rahway*, 24 *Id.* 160.

But we need not dwell on conjectural inconveniences of application of this act of 1897; they do not affect its validity, as shown under point 7 (*a*).

VI. The provision for extensions of terms is valid.

If the extension of terms was invalid it would not destroy the change of date in the election. This change is separable from the provisions for extensions, and the general law for holding over would prevent any serious inconveniences.

But such extensions by general law have been too often sustained to be disputed at this day. The constitution expressly provides that the legislature " shall pass general laws providing for the cases enumerated in this paragraph," and among those cases are " appointing local officers or commissioners to regulate municipal affairs."

In many cases where changes have been made in the duration of official terms the incumbents have been summarily dismissed before their terms ended—a grossly unjust procedure. In this case the proper method has been adopted of continuing the term. *Mortland* v. *Christian*, 23 *Vroom* 521, is decisive that the extension is valid, and such changes have been frequent. Take the case of freeholders: Change from spring to fall election of freeholders. *Pamph. L.* 1889, *p.* 165, §§ 7, 8. Fall to spring. *Id.* 1891, *p.* 461, § 3. Director-at-large from spring to fall. *Id.* 1893, *p.* 258. Freeholders and appointees extended to second Wednesday in May. *Id.* 1894, *p.* 248. In first-class counties extended till fall. *Id.* *p.* 355.

VII. The act is not inoperative for failure to provide fully for the election.

(*a*) If there were such failure it would not invalidate the change of date of the election. The legislature must remedy

the defects, if any. *Glen Ridge* v. *Stout,* 29 *Vroom* 598, 601, 602; *McGowan* v. *Metropolitan Life Insurance Co.,* 28 *Id.* 390.

In the last-cited case Mr. Justice Garrison said : " It may be true, as argued, that this act works confusion ; that it produces absurd results; that it never would have been enacted if its consequences had been foreseen. But whence arises any authority in the judicial department to nullify legislative action because of these or similar reasons ? "

(*b*) The election is fully provided for by section 1. By the General Election law the election boards are named in September next before election. *Gen. Stat., p.* 1364, § 358. Nominations are certified to the county clerk or city clerk. *Id., p.* 1359, § 339. The county clerk or municipal clerk shall provide the ballots (*Id., p.* 1356, § 326) and the envelopes (*Id., p.* 1351, § 318), and the county clerk shall distribute the ballots prepared by him to the city and other municipal clerks, who shall in turn distribute to their precinct clerks (*Id., p.* 1337, § 267).

Thus it will be seen the law requires the co-operation of the county clerk and city clerk.

By the act of 1897 the county clerk must provide the ballots on which city officers are to be voted for. By the Election law the nominations for city offices are filed with the city clerk, but this raises no real difficulty. When the duty is cast upon the county clerk to print upon the ballots the names of the candidates for city offices, it is implied that the county clerk shall ascertain who are the proper nominees from the public records in the office of the city clerk, where the certificates are deposited and are public records. It is a well-settled principle of statutory construction that powers granted imply all other powers necessary to carry out the granted powers. *Green* v. *New York,* 2 *Hilt.* 203, 209 ; *Green* v. *Cape May,* 12 *Vroom* 45, 46.

The same point comes up at every election of chosen freeholders in first-class counties. When the Election law was passed they were elected from assembly districts and their

certificates of nomination were ordered filed with the county clerk, who printed the ballots. By an act passed in 1894 (*Pamph. L., p.* 355) they are elected from wards and townships, and as municipal officers their certificates of nomination were thereafter filed with the city clerk (*Gen. Stat., p.* 1354, § 323), although the county clerk must still print the ballots. The county clerk gets a copy of the certificates from the office of the city clerk.

VIII. The act embraces only one object, and that is expressed in its title.

The object of the act is to fix the date of the election, and the other provisions are adjustments to the change. The title embraces this purpose and redundancies do not vitiate it. *In re Haines,* 25 *Vroom* 23, 24; *Calvo* v. *Westcott,* 26 *Id.* 78, 79; *Warner* v. *Hoagland,* 22 *Id.* 62, 73.

The title must express the end; the details are not necessary. *Johnson* v. *Asbury Park,* 29 *Vroom* 606; *McLaughlin* v. *Newark,* 28 *Id.* 300.

Statutes are vacated on this ground "only in a perfectly plain case." *Hammer* v. *Richards,* 13 *Vroom* 436.

We submit that this act is shown to be valid by the application of settled rules, and that to hold otherwise in this court is to tear down what the court has for twenty years been building up.

### DECISIONS ON STATUTES OF OTHER STATES.

In *Harwood* v. *Wentworth,* 162 *U. S.* 547, 563, there was considered an act of congress relating to territories, providing that their legislatures shall not pass local or special laws "regulating county and township affairs." An Arizona statute classified the counties of the territory and fixed the salaries of judges and officers on the basis of assessed valuation. Mr. Justice Harlan said: "The assessed valuation of property in a county furnishes a reasonable test of the character of the services required at the hands of the county officers. At any rate, the adoption of such test does not show that the act was

designed to defeat the objects of congress, nor that it is local or special legislation."

In *Dunne* v. *Railway Company*, 131 *Mo.* 1, 6, the statute considered provided for a selection of jurors in a special manner in counties containing cities with not less than fifty thousand nor more than three hundred thousand population. This included only two counties, and excluded St. Louis. The act was sustained. The court said : " The selection of juries, under the general law, in counties having large cities is liable to much abuse. Complaint of the character of juries selected was common. The law was intended to correct this evil, and to do so the classification was deemed necessary."

The. Missouri constitution prohibits any local or special laws on many subjects, including " regulating the affairs of counties," " regulating the practice before courts," or " summoning or empaneling grand or petit juries."

It will be observed that the fact that the legislation might. be equally applicable to St. Louis was not held to make it invalid.

In *State* v. *Miller*, 100 *Mo.* 439, 449, the court quoted with approval the remarks of our late Chief Justice, in Richards *v.* Hammer, where he said : " The marks of distinction on which the classification is founded must be such in the nature of things as will, in some reasonable degree at least, account for or justify the restriction of the legislature." In the Missouri case last cited an act was sustained increasing the number of school directors to twenty-one in cities of over three hundred thousand (St. Louis being at present the only one), the court deeming it appropriate that large cities should have a greater number of directors. *State* v. *Miller*, 100 *Mo.* 450. It is worth noting that in *Owens* v. *Furey*, 26 *Vroom* 3, the contrary suggestion of the court was that a single person might be fitter than a large body to choose officers in large towns, but the inconsistency is only apparent and the ground of the two decisions is the same. The court looks into the reasoning by which the legislation may be supported or assailed, not to see where the weight of argument lies, but to obtain

light on the question whether the class is germane to the subject. It is apparent that if the Missouri legislature may make the number of school directors in St. Louis greater than the number of those found in smaller cities, it may make the number less; and if the New Jersey legislature can transfer the appointing power from the council to the mayor in second-class cities, as was held in Owens *v.* Furey, it may reverse the process (as it has since done), so that the true lesson of these decisions is not that the court must approve what has been done, but merely that the classification must be germane to the purposes of the law. It is *res judicata* in New Jersey that the subject of municipal administration is germane to population; upon details the legislature must decide. See, also, *Johnson* v. *Milwaukee,* 88 *Wis.* 383, 391.

The main purpose of the act now under consideration is the change of date of the election found in the first section, and the residue is an adjustment of details. Some of these details are assailed.

In *Fort* v. *Cummings,* 90 *Hun* 481, 485, the validity of provisions incidental to the main purpose of the act was disputed. The court said: "Where the legislature has power to enact a law it has power to embrace in that law everything which is either necessary or proper to make it a complete whole. It can embrace in it everything germane to the main subject of the enactment and all necessary or proper details."

For the defendant in error, *Allan L. McDermott* (with whom was *William D. Daly*).

Before considering the constitutionality of chapter 28 of the laws of 1897, I call the attention of the court to the fact that it would be impossible to hold an election under this act.

The first section provides that "hereafter in all cities of the first class in this state, all municipal officers required to be elected therein shall be voted for and elected on the first Tuesday after the first Monday of November, in each year, and upon the same official ballots required by law for the election of state and county officers, and not otherwise." This

is the only section of the act providing for or regulating the manner of the election of officers in cities of the first class, and it is impossible to carry it into effect without holding that it repeals all provisions in the Ballot Reform law now governing elections in cities having a population of over one hundred thousand.

To entitle a candidate for the office of mayor of Jersey City to have his name printed on any official ballot, he must be nominated by a convention or by a petition, and his certificate of nomination or petition must be filed with the municipal clerk. Nominations for county officers are filed with the county clerk. *Gen. Stat., p.* 1344, § 323, *tit. " Election Act."* It is the duty of the city clerk to print the ballots for the municipal officers. *Id.*, § 325. Neither clerk can " print any name upon any ballots when such name was not included in any certificate or petition filed with him at least eight days before the election." *Ibid.* County and municipal clerks are forbidden to print upon any ballots any names not found in nominating papers filed in their respective offices. *Ibid.* There is not any provision of law which would authorize the county clerk of Hudson county to receive any certificate or petition of nomination for the office of mayor of Jersey City, nor is there any provision by which such county clerk can obtain knowledge of such a nomination. The nominations of all parties for that office must be filed with the city clerk of Jersey City. He cannot send them to the county clerk, nor can he, with official weight, certify the fact of a nomination to the county clerk. All certificates and petitions of nomination, when filed, "shall be open, under proper regulations, for public inspection, and the same shall be preserved for one year." *Id.*, § 323. Now, if the county clerk is to print only the names of candidates whose nominating papers are filed in his office (or whose nominations are certified by the secretary of state), and the city clerk is to receive, file and keep the nominating papers of candidates who are to be voted for only within the city, how is the county clerk, who furnishes the "official ballots required by

law for the election of state and county officers," to know what names of municipal candidates he is to print on those "same official ballots?" Are the municipal clerks to print the ballots for the state and county officers, or are the voters to write the names of the municipal officers on the county ballot? That it is not intended to put cities of the first class beyond the provisions of the Ballot Reform act is shown by the recognition of "official ballots." In short, there cannot, under the act of 1897, be any election for municipal officers held in Jersey City next November.

The act of 1897 is a local law, regulating the internal affairs of only two cities.

It must be admitted that the last five sections of this act can apply only to Newark and Jersey City. In an opinion published by counsel for relator, the municipal officers of Jersey City in office last April were advised that it was their duty to retain their offices, the proposition being, as I remember the publication, that, even if the consolidation of elections was unconstitutional, the last six sections of the act were supportable without the first one. The officers of Jersey City elected in April take their offices on the first Monday in May. Illustrated by the case of Mr. Wanser, the position was this: He took office on the first Monday in May, 1892, for a term of five years. Section 18 of the city charter provides that "the terms of office of officers elected under this act shall commence on the first Monday in May after the election unless otherwise directed." *Pamph. L.* 1871, *p.* 1094. Mr. Hoos qualified in April and became mayor of Jersey City at the first second of the first Monday in May. If, therefore, the third section of the act is sustained and the first rejected, it will extend the term of the incumbent until January, 1899. However, to comment further upon the divisibility of this act would be at the cost of seriousness. This statute is not sustained by a single decision interpreting the constitutional provision to which it is alleged to be obnoxious.

*Van Riper* v. *Parsons,* 11 *Vroom* 6: "All legislative regu-

lation of the internal affairs of cities should be the creatures, whenever practicable, of general laws framed for that purpose."

The only impracticability of extending the provisions of this act to all cities was found in the fact that it could not be passed in that shape. It passed the senate by eleven votes. If it had affected Camden, Trenton, Elizabeth, Rahway, New Brunswick, Paterson and all other cities, no one would have presented it to the legislature.

*Van Riper* v. *Parsons,* 11 *Vroom* 6: "Interdicted local and special laws * * * apply to persons, things or places possessed of certain qualities or situations and exclude from their effect other persons, things or places which are not dissimilar in these respects."

Jersey City and Paterson are divided into wards and these wards into voting precincts. Paterson has thirty-three voting precincts, in which there were cast at the last November election sixteen thousand and forty-one votes. In the Fourth, Fifth, Sixth, Seventh and Eighth wards of Jersey City there are thirty precincts. Adding the first three from the Ninth ward, we have the same number as in Paterson. At these thirty-three precincts there were cast in November last fourteen thousand one hundred and sixty-one, or one thousand eight hundred and eighty votes less than in the city of Paterson. Jersey City and Paterson have always held their municipal elections on the second Tuesday in April. What quality or situation is presented by these thirty-three precincts in Jersey City that entitles them to have their local officers chosen in national and state elections and will justify the withholding of the benefits of this law from the city of Paterson? See vote in *Fitzgerald's Legislative Manual, pp.* 386, 406.

*State* v. *Hammer,* 13 *Vroom* 440: There must be substantial distinction, having a reference to the subject-matter of the proposed legislation, between the places embraced in such legislation and the objects or places excluded.

In the argument in *Hoos* v. *O'Donnell* it was claimed that

there were three distinguishing characteristics by which a voter of a city of the first class could be identified on sight. First, he is disposed, it was asserted by Mr. Riker, to " contaminate his fingers with base bribes." This may be true in Newark, but as it is not true in Jersey City it will not support the inclusion of the latter town in the attempted classification. If it is true in Newark why consolidate the bribes by consolidating the elections? Before deciding this act constitutional on this ground the court should insist upon statistics. Secondly, it was contended that voters in large cities are apt to neglect municipal elections. This is not shown by election returns, but if it could be it contains the strongest argument against this bill. The citizen who votes only at national elections cares nothing about state and municipal affairs, while the citizen who votes only at general elections is not good citizen enough to have studied his duty. Both of these classes would vote party tickets, irrespective of the fitness of the nominees for local offices. Thirdly, it was argued that if officers in cities of the first class took their offices in January their terms would be nearer the commencement of the fiscal year in such cities. Why, then, were the terms of officers not made to commence with the fiscal year?

*Hammer* v. *State,* 15 *Vroom* 669: Normally, there can be, under our constitution, no such thing as local or special legislation to regulate the internal affairs of municipalities. Nor can any departure from the rule be justified except where, by reason of the existence of a substantial difference between municipalities, a general law would be inappropriate to some, while it would be appropriate to and desirable to others.

It is urged that a consolidation of elections will save expense to cities of the first class. But the expense of elections is, in all cities, about so much per capita. Municipalities are divided into voting districts, each to contain not more than six hundred voters. The same number of officers and ballots will be found necessary for each thousand voters in Trenton as are required in Jersey City. But why should large cities be relieved, while the double load is continued on the small municipal camels?

*Anderson* v. *City of Trenton*, 13 *Vroom* 486 : The question to be determined concerning the law now under review, therefore, is whether, since it does not relate to all cities, it affects a class of cities constituted upon this principle—whether the basis of classification is some peculiar feature to which the provisions of the law are naturally related.

Under the next census Paterson will become a city of the first class. Will the consolidation ·of elections then have a " natural relation " to that city ? Ingenuity cannot form an affirmative answer.

*Hightstown* v. *Glenn*, 18 *Vroom* 107: "What natural relation is there between a borough with thirty-one hundred inhabitants and the right of its common council to grant licenses which does not exist where the population is twenty-five hundred ?"

All cities in New Jersey elect their municipal officers at elections held separate from state elections.

*Van Giesen* v. *Bloomfield*, 18 *Vroom* 446 : There is nothing in the act *sub judice* that would render " like powers, if granted, inappropriate to and unavailing for other cities."

*Fitzgerald* v. *New Brunswick*, 18 *Vroom* 485 : Any " legislation touching any branch of municipal government which is common to all cities must include all cities or reduce all cities to uniformity in respect to the particular with which the legislation deals."

*Closson* v. *Trenton*, 19 *Vroom* 439 : " In respect to the subject-matter of the legislation, all cities are a class, and an attempt to segregate cities into distinct classes for this purpose [creation of an excise board] by a standard of population is not classification but an arbitrary selection of one or more localities for legislation."

*Long Branch* v. *Sloane*, 20 *Vroom* 363 : " If objects with similar characteristics and like relation to the legislative purpose have been excluded from the operation of the law, then the classification would be incomplete and faulty and the legislation not general but local and special."

*Warner* v. *Hoagland*, 22 *Vroom* 62 : " Population may

be made the basis of classification in statutes relating to municipal bodies and their police powers, but such a classification cannot be made the means of evading the constitutional interdict of local or special laws where the classification is plainly illusory."

*Mortland* v. *Christian*, 23 *Vroom* 521 : In this case it was held that an act providing that chosen freeholders should, in counties of the first class, be elected from assembly districts, with a director elected in each county at large, was valid.

The objection raised in the present case was not mooted in Mortland *v.* Christian, but if it had been the act might nevertheless have been declared constitutional, the legality of elections from assembly districts having been decided. It would be almost impossible to elect freeholders from assembly districts at town elections, and as the boards were to be reorganized to include a director elected by the county, the legislature followed the plan laid out by the framers of the constitution of New Jersey to elect county officers at the general election. The fact that the freeholders were to be elected from divisions used only at general elections might, if the question had been argued, have been sufficient to remove objection. Sheriffs and coroners are elected at general elections, so when the office of register of deeds was created for Essex county in 1859, it was provided that he should be elected at the next annual election. *Gen. Stat., p.* 2733. So when the office was created for Hudson county (*Pamph. L.* 1874, *p.* 324) and for Camden county (*Id.* 1875, *p.* 285). The act of 1889 was not prudent legislation, but it at least furnished ground for an argument in support of its provision that the freeholders should be elected at the general election, and had the support of precedent for the election of the county director. But one step leads to another, and in 1894 the boards of chosen freeholders, in counties of the first class, were again made direct representatives of particular municipalities. The office of director-at-large was abolished, but the scheme of choosing the freeholders at the general election, in counties of the first class, was continued. The

board in Hudson county, elected last November, is, in the political complexion of its majority, different from that chosen each of the dozen previous years. The cause is plain. One set of candidates ran on the St. Louis national platform, while the other stood on the declaration of principles adopted at Chicago.

*Owens* v. *Fury,* 26 *Vroom* 1; *Matheson* v. *Caminade, Id.* 4; *McLean* v. *Gebson, Id.* 11, were all decided upon the ground that the adjustment of the machinery of local government is within the legislative power, when the limits of that adjustment are not evasive of the constitution.

The act of 1897 does not deal with the machinery of government. It does not give, add or subtract powers, except as it incidentally extends official terms. Its sole object is to provide that the local elections in Newark and Jersey City shall be held under certain influences which, by the declared policy of the state, should not be allowed to affect municipal elections.

*Calvo* v. *Westcott,* 26 *Vroom* 80: "The Classification act is a mere formula, a convenient method by which to avoid the repetition of words and numerals when legislating for or interpreting enactments concerning municipalities. Beyond this it is incapable of exercising any controlling effect upon either the legislature or the courts."

If this legislation is supportable, what objection could be found to a consolidation of elections in cities of the first class having more than two-thirds of the entire population of the county? This would exclude Jersey City. Or in cities of the first class which have gained or shall gain more than twenty per cent. in population between the taking of censuses? This would exclude Newark.

*Goldberg* v. *Dorland,* 27 *Vroom* 369: There must be such a rational basis of classification as to mark the objects so designated as requiring exclusive legislation.

*Dempsey* v. *Newark,* 24 *Vroom* 8: "Constitutional provisions are not to be feebly treated nor construed in the narrow sense of their letter, but liberally according to their manifest purpose and spirit. Nothing can be more conspicuous than that,

by the constitutional provision under criticism, it was intended that when the internal affairs of a city could be regulated by a general law they should be so regulated."

*McLaughlin* v. *Newark,* 28 *Vroom* 299 : "It thus appears that the statute deals only with the structure of municipal government, the formation of the machinery by which the affairs of the city are to be regulated ; that, for such legislation, the municipalities of the state may be distributed into classes constituted on the basis of their population seems to be settled beyond dispute in this court."

This case was much relied upon in the argument for the respondent in Hoos v. O'Donnell, but I fail to perceive its relevancy to the issue. How municipalities shall be governed is the principal inquiry of legislators. Formerly it was answered by the representatives of each municipality, whose determination guided their legislative associates. Now, the question of imposing the evils the constitutional amendments were intended to prevent is left to those who represent the various classifications. If Newark and Jersey City unite on a legislative plan, it is sure of enactment. If the representatives of either Newark or Jersey City are in sympathy with the political majority, one must suffer from any unwise legislation desired by those who manage affairs in the other. Jersey City had four members of the board of street and water commissioners, and had sufficient. Newark wanted five, and it being plain that it would be unconstitutional to have five in one city of the first class and four in another, Jersey City must add to her number. The result of classification has been that where one city of the first class would probably have escaped injury under special legislation, two must now be joined in the law. In cities of the second class eight are affected, often at the desire of the representatives of one or two who are in sympathy with the political majority in the legislature. It would have been well for our cities if the plan of classification had remained undiscovered ; but now that it is established, I submit that there does not exist good reason for sustaining the use of an arbitrary and irrele-

vant classification in debasing the municipal governments of Newark and Jersey City. The question is not one of the structure of municipal government, nor of municipal machinery, but whether, in cities having a population so large that issues of state and national policy are vigorously discussed on every corner, municipal officers shall be chosen on issues that have nothing to do with municipal government.

*In re Haynes,* 25 *Vroom* 23 : " It is true that streets and water-supplies are matters common to all cities, no matter what their grade; but this legislation does not attempt to deal with these things in this wide point of view. What it deals with is exclusively the machinery by which such interests are to be regulated. If, therefore, municipal population, when it is large, does not reasonably require a different kind of machinery from that which is suitable to a small population, then it would be plain that the position of counsel of the relators just referred to would be impregnable."

In the legislation before the court there is not any attempt to provide machinery for electors in cities of the first class different from that used in other cities. Voters are to be registered, nominations must be certified and ballots must be official. The proposed differentiation is not one of form—it is not sought to provide a novel system of government for cities of the first class. It is proposed to differentiate these cities on a question of public policy that has been discussed by every writer on American politics, and upon the elective system elsewhere. One form of government may be adapted to very large cities and inappropriate to smaller divisions, but there cannot exist in one class of cities a reason for nor an objection to the consolidation of municipal and national and state elections which does not exist in every class. The object of this bill is to tie questions of municipal government to state and national kites. If this is good work, why deprive cities of the other classes of the benefits ? If the object is economy, why limit the benefit ? If the object is to bring out a large vote, why limit the invitation to cities of the first class ? If this classification is not illusory, neither would be

one confining the act to cities of the first class on the Hudson river, because it could be argued, with more force than will be found in a mere population classification, that many residents of Jersey City go to New York early and return late on election days, and will not take the trouble to vote twice a year; or to cities having a certain percentage of foreign-born voters, because they have opportunity of instruction only at the fall canvass. The masks of "economy" and "large population" are transparent; behind them is seen the desire to unite municipal issues with questions of state and national policy. This is the "principle" of the act, and if the court will examine the legislative record it will be at once seen how promptly this "principle" would have been rejected if the bill had not been confined to cities wherein it was supposed that some partisan advantage would accrue from linking municipal issues with, for instance, the question of whether this nation should proceed, in a hurry and independent of other nations, to the free and unlimited coinage of silver. The act was passed by eleven votes in a senate having eighteen senators of the same political faith as the eleven. That the enacted policy of the state to keep municipal and other elections apart was not born of iridescent dreaming is shown by history. In the past twenty-one years Jersey City has elected three Republican candidates for mayor—in 1876, in 1884 and 1892. Each of these was a presidential year, in the autumn of which the city was carried by a large Democratic majority. Had the elections been united, it is safe to say that Jersey City would not have elected a Republican mayor in the last twenty-one years. Why should less populous cities be outlawed from the municipal felicity that would have been produced by this unison?

This state has always been opposed to the consolidation of local and state or national elections, and that opposition is indicated in the constitution and the statute-book.

By "An act to regulate the qualification of representatives to serve in general assembly in this Province of New Jersey," passed April 4th, 1709, it was provided that the general assem-

bly should be chosen by the votes of those freeholders in each county who owned one hundred acres of land or were worth fifty pounds in real and personal estate. *All. L., p.* 4.

By "An act explaining the right of voting at town meetings and the election of township officers," passed June 28th, 1766, the right to vote at town meetings was given to freeholders, tenants for years, householders and residents of the townships. *All. L., p.* 288.

So we have it that, in provincial days, there was a difference established between the persons who were allowed to vote at town meetings and those who could vote for members of the general assembly. So the mode of election was different, and it was provided in 1725 that at elections for the general assembly the officer to whom the writ of election was sent should not "declare the choice upon the view," but should poll the voters, which was done by "setting down the names of the electors and the place of their abode, and the person they gave their votes for." *All. L., p.* 69. Township elections were held by a "majority of voices" (*Id., ch.* 37, *p.* 14) and by "plurality of voices" (*Id., ch.* 77, *p.* 36).

The first constitution of New Jersey, section 3, provided that the second and subsequent legislatures should be chosen on the second Tuesday in October. The legislature was not empowered to change this day. Sheriffs and coroners were to be chosen at these elections. Section 13. They were to be chosen at county elections, the wording of section 3 being that "the counties shall choose."

Section 14 provided that the townships at their annual town meetings for electing other officers, should choose constables, freeholders and commissioners of appeals.

By "An act to regulate the election of members of the legislative council and general assembly, sheriffs and coroners in this state," passed February 22d, 1797 (*Pat. L., p.* 229), it was provided that the election of these officers should be by ballot, to be deposited in a box. *Id.,* § 8. The election was to be held at the place where the town meeting had been held, or at such place as the people at their town meeting

should appoint. *Id.*, § 3. All persons of full age, worth fifty pounds, proclamation money, and having resided in the county twelve months immediately preceding, were entitled to vote. *Id.*, § 11. The returns were to contain "a list of all the candidates voted for, of the offices proposed for them, and of the number of votes for each," and were to be in a prescribed form, which called only for the votes cast for candidates for state officers, sheriffs and coroners. *Id.*, § 13.

By "An act incorporating the inhabitants of townships, designating their powers and regulating their meetings," passed February 21st, 1798 (*Pat. L.*, *p.* 276), it was provided that every man who should have resided in any township six calendar months next preceding such town meeting, and paid taxes within the same, or be seized of a freehold, or rented a tenement of the yearly value of five dollars, should be entitled to vote at a town meeting. Those meetings were "directed and required" to be held, in the counties of Burlington, Monmouth, Salem, Cumberland and Cape May, on the second Tuesday of each March; in Bergen, Essex, Somerset, Middlesex, Hunterdon, Morris and Sussex on the second Tuesday in April, and in the county of Gloucester on the second Wednesday in each March. *Id.*, §§ 3, 5.

It will be seen that a century ago the people of New Jersey had not been informed of an overruling economy that would justify consolidation of state and municipal elections.

When the "town and port" of Burlington was incorporated, it was provided that the annual town meeting should be held on the first Tuesday of March. *Pat. L.*, *p.* 71, § 4.

When the charter, rights and privileges of the borough of Elizabeth were confirmed, it was provided that its officers should be elected at meetings to be held on the second Tuesday in April. *Pat. L.*, *p.* 95.

When New Brunswick became a city, it was provided that its officers should be yearly elected on the first Tuesday in April. *Pat. L.*, *p.* 57.

When the incorporation of the town of Paterson was provided for, it was enacted that the municipal elections should

be held on the second Tuesday in April. *Pat. L., p.* 112, § 28.

When the "North ward of Perth Amboy and a part of the township of Woodbridge" were made "the city of Perth Amboy," it was provided that the freemen should elect their city officers on the second Tuesday in March. *Pat. L., p.* 66, § 6.

When Trenton was made a city, its elective officers were directed to be chosen on the second Tuesday in April. *Pat. L., p.* 117, § 3.

The first law for the election of representatives in congress was passed at Princeton, November 21st, 1798. It provided that representatives should be elected in February, 1799. *Acts of Assembly* (Collins, publisher), *ch.* 241, *p.* 477.

In 1790 it was enacted that representatives in congress should be elected on the fourth Tuesday in January, 1791. *Laws of* 1789–1798, *ch.* 337.

In 1792 it was provided that the representatives should that year be elected in October, at the general state election. *Laws of* 1789–1798, *ch.* 373. As there was a presidential election that year, there may be seen here a desire to keep the election of representatives free from the national canvass.

In 1794 it was provided that representatives should be elected on the last Tuesday of December in that year. *Laws of* 1789–1798, *ch.* 490. This act was passed November 17th, 1794. It is possible that the consolidation of the election of state officers and representatives in 1792 was not satisfactory, for the act under which the election of 1792 was held was repealed on the 21st of February, 1794. *Id., ch.* 479.

In 1796, a presidential year, it was enacted that the next election for representatives should be held in January, 1797. *Laws of* 1789–1798, *pt.* 2, *p.* 119.

In March, 1798, it was enacted that the next representatives should be elected at the state election in October of that year. *Laws of* 1789–1798, *ch.* 705, *p.* 310.

It will be seen that the legislature of the last century made the election day for representatives a movable feast, which

will account for the fact that Paterson's Laws, published in 1799, do not contain any statute fixing a day for their election.

In 1803 it was enacted that representatives should be elected in December of that year. *Laws of* 1800–1806, *ch.* 91, *p.* 222.

In 1804, presidential year, it was enacted that representatives should be elected in November. *Laws of* 1800–1806, *ch.* 116, *p.* 310.

In 1804 it was enacted that representatives should be elected at the same time as the legislature. *Laws of* 1800–1806, *ch.* 100, *p.* 654.

The act of 1804 effected economy by reducing the number of annual elections to two, and this economy was followed in 1806, but that it was felt undesirable to have national and state issues joined is shown by the work of the next legislature.

In 1807 (*Rev.* 1821, *p.* 534) it was provided that the election of representatives in congress would be on the first Monday in November, at the same time as members of the electoral college. That thereafter, in years when there was not any national election, representatives should be elected at the October election for legislators, sheriff and coroners, but that, in presidential years, congressmen should be elected in November. *Id.*, § 7.

In 1820 it was enacted that no person should vote for officers of county, state or United States unless worth fifty pounds, and resident in the county at least one year immediately preceding election. *Rev.* 1821, *p.* 741. At this time the law of 1798, allowing those who had resided in the township six months, &c., to vote at town meetings, was yet in force. *Id., p.* 340, § 5. No provision was made to punish bribery at township elections, while penalties were imposed for bribery or intimidation at presidential and state elections. *Id., p.* 276, § 12. No person could vote at a state or county election who had not paid his tax. *Laws of* 1820, § 38.

From the declaration of independence to the adoption of the constitution of 1844 the qualification necessary to vote

for municipal officers was different from that required to vote at state and county elections.

In 1831 it was provided that no person should be arrested on "either of the days on which the elections of this state are, by the constitution and laws, directed to be held, or upon any other day of any county or state election, held by virtue of any law of this state." *Elm. Dig., p.* 158, § 49. This provision did not apply to township elections, and is yet confined to general elections. See *Gen. Stat., p.* 1297, § 13.

We have it, then, that before the convention of 1844 municipal and state elections were held on separate days, and in presidential years the election of congressmen was separated from the election for state and county officers; that greater qualifications of residence and property were required to entitle a citizen to vote at a general election than were required at municipal elections; that general and local elections were held in different manner, and that corruption at the former only was legislated for.

The next view, in the orderly following of this inquiry, is of the constitutional convention of 1844, and I expect to show—

(*a*) That the convention of 1844 gave the subject of consolidation of elections much consideration, and twice rejected propositions to consolidate national and state elections.

(*b*) That the constitution adopted by that convention places it beyond the power of the legislature to consolidate local and general elections so that but one election shall be held annually in any or all cities.

On May 17th, 1844, a report was made to the convention by the "committee on right of suffrage, the qualifications of persons to be elected." The committee consisted of J. R. Thomson, chairman, and Messrs. Wurts, Elmer, Halsted, Holmes, Mickle and Wood. The report provided that "the legislative election shall be held annually and forever on the second Tuesday of October." See "Newark Daily Advertiser," May 18th, 1846, and "Journal of Convention."

On May 27th this section was taken up for consideration.

Mr. Child moved to strike out "October" and insert November.

Mr. Hornblower suggested that they had better make it a movable day, so as to enable them to conform to the law of congress, should it be passed, regulating the presidential election.

Mr. Thomson said the committee had unanimously agreed on October "for the purpose of avoiding a confliction between the presidential election, which it was desired to keep separate." See "Newark Daily Advertiser," May 28th, 1846, and "Journal of Convention."

The debate was resumed May 29th, when Mr. Randolph moved to insert "November" instead of October.

Mr. Parson advocated the change as a more convenient season. Mr. Ewing opposed it. Mr. Green said that was a question upon which he had heard but little said. He had rather inclined to vote for the amendment. It has been suggested that November is a more pleasant season of the year, and a less busy one. It is a mere question of convenience; but he held it to be important that the election should be as short a time before the meeting of the legislature as possible and give the members time to make their arrangements. He likewise deprecated the idea of having the state elections at the same time with those of the general government, by which the interests of the state are swallowed up in the mammoth struggle for the executive patronage of our government. He said that now thousands of votes were given in New Jersey without reference to mere party interests, and he wished it might continue so to be.

The amendment to change the day of state elections from October to November was defeated. See "Newark Daily Advertiser," May 30th, 1846, and "Journal of Convention." The question rested until the 17th of June, when it was fully debated and a proposition to consolidate the national and state elections was again defeated, as appears by the proceedings. See "Journal of Convention" and "Advertiser," June 19th and 20th, 1844.

It will be noticed that the question was whether national, state and county elections should be consolidated. Municipal elections were not discussed, and reference to such elections—then always referred to as town meetings—is had in our constitution only with regard to the office of justice of the peace, but that reference clearly establishes the intention of the convention that local and general elections should not be held at the same time. Power was given the legislature to change the date of the election of state officers. This was so that there should be but one general election, if legislative wisdom should so decide, but no one dreamed then that spring elections could or would be abolished, and, for the office of justice of the peace, they cannot be.

There would have to be, notwithstanding this act, an election held in Jersey City every April. Article 7, section 2, paragraph 8, provides that justices of the peace shall be elected by ballot at the annual town meetings of the cities that may vote by wards ; that they shall be commissioned for the county, and that their commissions shall bear date and take effect on the 1st day of May next after their election. They hold their offices for five years, but not until their successors are elected. Their terms cannot be extended by the legislature, and vacancies cannot be filled except at an election. The constitution provides that they shall be elected at the town meetings, and article 6, section 7, provides how many justices of the peace each township or ward may have. These justices are not municipal officers. Section 6 of "An act relative to justices of the peace" (*Gen. Stat., p.* 1860) provides that two statements of the result of every election for justices of the peace shall be made. One of these is to be sent to the county clerk and the other to the secretary of state. It follows that if there is not to be a local election in Jersey City each year before the 1st day of May, the constitutional regulation of this office must be disregarded.

Under the act of 1897, if there had not been an election last April, successors to the justices of the peace whose terms expired on the 1st of May would have to be elected next

November, and commissioned on the 1st of May, 1898, and as they would be elected to fill vacancies caused by failure to elect prior to May 1st, 1897, they would hold for only four years. Of course, time would cure this trouble, and after the office of every justice of the peace in Jersey City and Newark had been vacant for a year, the justices elected in November could be commissioned for full terms commencing seven months later. But the command of the constitution is that these officers shall be elected. The office is a constitutional one and the legislature cannot so arrange our election laws that the office of every justice of the peace whose term expired on the 1st of May, 1897, shall remain vacant for one year. In 1844 all town meetings were held annually before the 1st day of May, and when the constitution provided that justices of the peace should be elected at the next annual town meetings, that they should hold office for five years, and thereafter justices should be elected at the annual town meetings, it was put beyond the power of the legislature to deprive the people of the right to fill these offices at an election held, each year, before the 1st of May. That the legislature may constitutionally provide for the consolidation of elections for all state and township officers in all towns is beyond question, as is the fact that it will never be done; but that the people of every town have the constitutionally guaranteed right to vote for justices of the peace every year that a term expires, and to do that voting before the 1st of May in that year is written so that the plea of economy, at least, is fortunately taken from those who would elect mayors of our cities on national issues. That local elections should be kept free from discussions of questions of political principles has been determined by nearly every state in the Union. The attitude of New Jersey is found not only in the practice of over a century and in constitutional implication, but in express statute. By chapter 58 of the laws of 1889 it was recited and enacted as follows:

"WHEREAS, it is deemed for the best interest of municipal

government that elections for local officers should not be held on general election days; therefore,

"1. *Be it enacted, &c.*, That no local or charter election shall be held in this state on the same day fixed for the holding of a general election, or on the day when members of the general assembly are now elected by law."

It is then enacted that in all cities where charter elections were held on general election days they should be thereafter held in December.

This act was passed to meet the case of the city of Elizabeth. By chapter 168 of the laws of 1867 it was provided that the municipal election in Elizabeth should be held on general election day. The plan of holding elections in December was found objectionable because they were held in the shadow of state and national elections, and it is now provided that municipal elections in all second-class cities shall be held in April.

Who does not recall the conditions which governed municipal elections in the city of Newark, a few years ago, when they were held in October? Every four years the election of a mayor of that city attracted the attention of the entire country. The question of how Newark would vote was made of national importance, and it would not be surprising to learn that contributions came from Maine and California to aid the people of that town in securing proper municipal government.

The following provisions from the constitutions and statutes of other states show how generally the necessity of separation has been recognized:

*Alabama.*—No constitutional provision. The code of Alabama provides that state and county officers shall be elected in August. *Code*, §§ 339, 441. Presidential electors and congressmen are elected in November. Municipalities fix the dates for their local elections.

*Arkansas Constitution, art. 3, § 8.*—The general elections shall be held biennially on the first Monday in September, but the general assembly may by law fix a different time.

Congressmen are elected in November. City and town elections are held on the first Tuesday in April. *Dig. Stat.*, §§ 5127, 5259. This state, with only two-thirds of the population of New Jersey, keeps national, state and municipal elections separate, as was done here prior to 1845.

*California Constitution, art.* 4, § 3.—The state elections are held in November unless otherwise ordered by the legislature. Cities fix the days for their municipal elections. *Pol. Code,* § 4369.

*Colorado Constitution, art.* 7, § 7.—The general election shall be held on the first Tuesday of October, in the years of our Lord 1876, 1877 and 1878, and annually thereafter on such day as may be prescribed by law. Municipal elections are held in April. *Mills Ann. Stat., p.* 1160.

*Connecticut Constitution, art.* 10, § 2.—State officers are elected in November. The time for local elections is left to the legislature. Municipal elections are held in New Haven in December, in Bridgeport in April and in every other town in October. *Gen. Stat., ch.* 7, § 32.

*Delaware Constitution, art.* 4, § 1.—State officers, sheriffs and coroners are elected in November. Municipal elections are held in April. *Rev. Code, p.* 394, § 7.

*Florida Constitution, art.* 3, § 3.—State officers are elected in November. Municipal elections are held on days fixed by the municipal authorities. *Rev. Stat.,* § 700. At the general elections eight ballot-boxes are provided for each polling-place, so that the voters cast a separate ballot for each candidate other than those for county officers, who are voted for on one ballot. *Id.,* § 179.

*Georgia Constitution, art.* 5, ¶ 3.—State officers are to be elected in October, until date is changed by legislature. Municipal officers are elected on the same day. *Code,* § 1286. Congressmen are elected in November.

*Idaho.*—No constitutional provision. General election held in November. *Rev. Stat.,* § 466. Municipal officers are elected at the same time. *Id.,* § 1813.

*Illinois.* — Governor and other non-judicial officers are

elected in November. *Starr & Curt. Ann. Stat.*, *ch.* 49, ¶¶ 6, 9. Judges of the Supreme Court are elected in June, except the judges of the Cook County (Chicago) Court, who are elected in November. *Id.*, § 10. Municipal elections are held in April. *Rev. Stat.*, *p.* 222, § 48.

*Indiana Constitution*, *art.* 2, § 4.—All general elections shall be held on the first Tuesday after the first Monday in November, but township elections shall be held at such time as may be provided by law; provided, that the general assembly may provide by law for the election of all judges of courts of general or appellate jurisdiction by an election to be held for such officers only, at which time no other officers shall be voted for. This is an amendment for a section providing that "all general elections shall be held on the second Tuesday in October." Municipal elections are held in April and May. *Rev. Stat.*, §§ 3476, 3906, 4326.

*Iowa Constitution*, *First Amendment.*—All elections are held in November.

*Kansas Constitution*, *art.* 5, § 2.—General elections shall be held annually in November. Township elections shall be held on the first Tuesday in April, unless otherwise provided by law.

*Kentucky Constitution*, § 148.—No officer of any city, town or county, or of any subdivision thereof, except members of municipal legislative boards, shall be elected in the same year in which members of the house of representatives of the United States are elected. District or state officers, including members of the general assembly, may be elected in the same year in which members of the house of representatives are elected.

*Louisiana Constitution*, *art.* 191.—State elections are held in April. Legislature may change date. Local elections are held in New Orleans and Shreveport on same day as general state election.

*Maine Constitution*, *art.* 2, § 4.—State elections shall be held "on the second Monday in September annually forever." Municipal elections are held in March. *Rev. Stat.*, *p.* 79, § 12.

*Maryland Constitution, art.* 2, § 1.—State officers are elected in November. The constitution provides that the election of officers in Baltimore shall be held on general election day. By reference to the local laws which regulate the other municipalities, it will be found that the example of Baltimore has not been followed, the other towns holding their elections in the spring or summer. *Pub. Loc. L., vol.* 1, *p.* 100, § 28 ; *Id., p.* 650, § 75 ; *Id., p.* 663, § 118 ; *Id., p.* 669, § 150 ; *Id., p.* 676, § 170, &c. The election day in each town is fixed by special statute, but Baltimore stands alone in electing local officers at the general election.

*Massachusetts Constitution, article of amendment* 15.—State officers are elected in November. Town meetings are held in February, March or April. *Pub. Stat., p.* 232, § 53.

*Michigan Constitution, art.* 4.—State officers are elected in November, while it is provided by article 11 that municipal officers shall be elected in April. Town and city officers are elected on the first Monday in April. *Howe. Ann. Stat.,* §§ 677, 2450.

*Minnesota Constitution, art.* 7, § 9.—General elections are held in November. Municipal elections are held in April. *Gen. Stat.,* § 1047.

*Mississippi.*—The general election for state officers was enacted to be held on the first Monday in November, 1895, and every four years thereafter, keeping the national and state elections separate. *Code,* § 3632. Municipal elections are held on the second Tuesday in December of congressional years. *Id.,* § 3030. This separates the municipal from national elections.

*Missouri.*—It is provided that state elections shall not be held on national election days. Missouri townships elect on the last Tuesday in March. Cities of the first class (over one hundred thousand population), of the second class (over thirty thousand and under one hundred thousand), of the third class (over three thousand and under thirty thousand), and of the fourth class (less than three thousand), all elect municipal officers on the first Tuesday in April. *Gen. Stat.,* §§ 985, 1444, 1467.

*Montana.*—General election in November. *Pol. Code,* §
1150. Municipal elections are held in April. *Id.,* § 4748.

*Nebraska Constitution, art.* 5.—General election held in
November. Municipal elections are held in April. *Comp.
Stat.,* § 2328.

*Nevada Constitution, art.* 15, § 5.—General election is held
in November. All officers are elected at this election. *Gen.
Stat.,* §§ 1643, 1656.

*New Hampshire Constitution, pt.* 2, § 42.—General election
in November. Municipal elections are held on the second
Tuesday in March. *Pub. Stat., p.* 146, § 1.

*New York.*—Everyone familiar with the political history
of New York will recall that, in its chief city, presidents of
one party have been defeated to elect mayors of the opposite
party. The constitutional convention held in that state in
1894 determined to prevent repetition of this, and that deter-
mination was ratified by the people. Article 12, section 3, of
the new constitution provides that the municipal officers of
New York city shall be elected on " the Tuesday succeeding
the first Monday in November in an odd-numbered year, and
the term of office of such officers shall expire in an odd-num-
bered year." Terms of officers expiring in even-numbered
years are extended one year.

*North Carolina Constitution, art.* 2, § 27; *art.* 3, § 1.—
State officers are chosen on the first Thursday in August, with
power in general assembly to change time of election. All
municipal officers are elected on the first Monday in May.
*Code,* § 3797.

*North Dakota Constitution,* § 124.—General elections are
held in November. Municipal elections are held in March.
*Rev. Stat.,* § 2541.

*Ohio Constitution, art.* 10, §§ 2, 4.—State and county officers
are elected in November; municipal officers at times fixed by
law. By law all municipal elections are held in April. *Rev.
Stat.,* §§ 1442, 1723.

*Oregon Constitution, art.* 2, § 14.—General state elections
are held in June.

*Pennsylvania Constitution, art.* 8, §§ 2, 3.—The general

election shall be held annually on the Tuesday next after the first Monday in November, but the general assembly may by law fix a different day, two-thirds of all members of each house consenting thereto. All elections for city, ward, borough and township officers for regular terms of service shall be held on the third Tuesday of February.

*Rhode Island Constitution, art.* 8, § 1.—State officers are elected at the municipal elections on the first Wednesday of April. The state officers are voted for upon a separate ticket. *Id.,* § 3.

*South Carolina.*—General election is held in November. *Rev. Stat.,* § 162. Local elections are held on days fixed by town authorities. *Id.,* §§ 1562, 1584.

*South Dakota Constitution, art.* 26, § 28.—General state election in November. Municipal elections are held in April. *Laws of* 1890, *p.* 87.

*Tennessee Constitution, art.* 7, § 5.—State officers are elected in August. Each municipal corporation may fix the day for its local election. *Code,* § 1964.

*Texas Constitution, art.* 3, § 27 ; *art.* 4, §§ 1, 2.—State officers are elected on a day fixed by law for election of legislature. This day is fixed by proclamation of the governor. *Rev. Stat., art.* 1722. City and town elections are held in April. *Id., art.* 388.

*Utah Constitution of* 1895, *art.* 4.—All general elections, except for municipal and school officers are held in November. Municipal and school officers are to be elected at a time fixed by statute. Local officers are elected in August. *Comp. L.,* § 238.

*Vermont Constitution, ch.* 2, § 8.—State officers shall be elected in September. Municipal officers are elected in March. *Gen. Stat.,* § 2972.

*Virginia Constitution, art.* 5, § 2.—State officers are elected in November. County officers are elected in May. *Id., art.* 7, § 1. Municipal officers are also elected in May. *Code,* §§ 92, 98.

*Washington Constitution, art.* 2, § 6.—General elections in

November, " unless otherwise changed by law." *Id., art.* 11, § 5. Date of local elections to be fixed by law. Municipal elections are held in December. *Hill's Ann. Stat.,* §§ 546, 625, 663.

*West Virginia Constitution, art.* 4, § 7.—General elections are held in November. Municipal officers are elected in January. *Code, p.* 413, § 17.

*Wisconsin Constitution, art.* 13.—General election in November. Municipal officers are elected in May. *Gen. Stat.,* § 871.

*Wyoming Constitution, art.* 3, § 5.—General election in November. Election of municipal officers to be regulated by statute. *Id., art.* 12, §§ 4, 5. All municipal elections are held in the first five months of each year. *Rev. Stat.,* §§ 147, 208, 271, 323, 351.

It will be seen that Nevada, Idaho and Iowa are the only states that do not provide for the separation of municipal from state and national elections, while Alabama, Arkansas, Maine, Mississippi and North Carolina keep national, state and municipal elections apart.

It will be seen that nearly every state in the Union has, in its constitution, recognized the importance of separating national and state from municipal elections. In a few states special laws have been passed consolidating elections in large cities, but it has never been suspected, outside of judicial presumption, that these laws were enacted in the interest of good government.

The endeavor of my argument has been to establish that the separation of elections involves a question of policy, the determination of which affects all municipalities, irrespective of population; that it is the generally accepted conclusion that consolidation does introduce to the municipal aspect of the election, features, powerful, if not dominating, having no proper relation to municipal government. If this is established, it follows that the policy of consolidation, be it good or evil, cannot be limited, in legislative application, to cities of the first class.

The opinion of the court was delivered by

DEPUE, J. The issue presented in this case is upon the validity of an act of the legislature, passed March 18th, 1897, entitled "An act relating to cities of the first class in this state, and providing for the holding of municipal and charter elections therein, and regulating the terms of elective and appointive officers therein." *Pamph. L., p.* 43. It provides that all municipal officers in cities of the first class shall be elected in each year on the first Tuesday after the first Monday of November, which is the day fixed for the annual election of state and county officers, and upon the same official ballots required by law for the election of state and county officers. It combined the election of municipal officers with elections for state and county officers, which theretofore had been kept separate. The contention was that this act was in violation of constitutional provisions. This contention was sustained by the Supreme Court.

Paragraph 11, section 7 of article 4 of the constitution provides that the legislature shall not pass any private, local or special laws in certain enumerated cases, among which is "regulating the internal affairs of towns and counties." This constitutional prescription is a restriction on the sovereign power of the legislature that did not appear in either the constitution of 1776 or 1845. It was introduced into the organic law of this state by an amendment in 1875, and grew out of the public appreciation of the evils that sprang from local and special legislation in relation to municipal affairs. The people, in adopting this constitutional provision, intended to eradicate the source of these evils. In language too plain and explicit to be misapprehended it prohibited the legislature from passing any local or special law on those subjects and restricted such legislation to general laws.

The construction and force of this constitutional provision present a legal question to be decided by the courts. *State* v. *Rogers,* 27 *Vroom* 480. The course of legislation on this subject by the legislature, while it is entitled to respect, cannot be permitted to control the decision of the judicial

department of the government in its construction of the constitutional provision, for, as was said by Chief Justice Marshall, in *Cohens* v. *Virginia*, 6 *Wheat.* 264, 389, "the power to make or unmake (the fundamental instrument of government) resides only in the whole body of the people and not in any subdivision of them."

The legislature may, without infringing on this constitutional interdict, resort to classification for the convenience of legislation. The act of 1882 (*Gen. Stat., p.* 458), by which cities were divided into classes on the basis of population, and other statutes by which boroughs and counties were in like manner divided, are instances of such legislation. The act of 1882 expressly declares that the classification therein made was for the purpose of municipal legislation in relation to cities, and that all legislation founded upon such classification should be construed to embrace all cities of the class referred to.

The courts, in a series of cases too numerous to be cited, have given to this constitutional provision a fixed construction. In the first case in which this provision came before the court, a general law, as contradistinguished from a special or local law within the meaning of the constitution, was defined to be a law that embraced a class of subjects or places and did not omit any subject or place naturally belonging to such a class. *Van Riper* v. *Parsons*, 11 *Vroom* 1.

The test of the generality of a law adopted is that it shall embrace all and exclude none whose conditions and wants render such legislation equally appropriate to them as a class. It is also equally well settled by decisions of our courts that, although population may be made the basis of classification in statutes relating to municipal bodies, such a classification cannot be made the means of evading the constitutional interdict of local or special laws. The question whether any particular statute is local or special must be determined not upon its compliance with a legislative classification, but upon whether, having regard to the character of the legislation and the limitation upon it contained in the act, the statute is or is not a general law as defined by the courts.

The Supreme Court of the United States has likewise proceeded upon this principle in deciding upon the validity of statutes under the equality clause in the fourteenth amendment to the federal constitution. In *Gulf, Colorado and Santa Fe Railway Co.* v. *Ellis,* 165 *U. S.* 150, the court held that there might be classification for the purposes of legislation, but that the mere fact of classification was not sufficient to relieve a statute from the reach of the equality clause of the fourteenth amendment, and that in all cases it must appear not merely that a classification has been made, but also that it is based upon some reasonable ground—something which bears a just and proper relation to the attempted classification, and is not a mere arbitrary selection; and in the application of that principle the court set aside an act of state legislation as in violation of the constitutional provision.

It must not therefore be inferred from the language used in the opinions of the courts that the mere aggregation of individuals in a municipality is the actual basis on which a classification may legitimately rest. The constitutional prescription relates to the regulation of the internal affairs of towns and counties without regard to population, and it applies as well to the lesser as to the greater municipalities in this state. In *In re Haynes,* 25 *Vroom* 25, 28, Chief Justice Beasley, in discussing this subject, speaking of an act establishing a board of street and water commissioners in cities of the first class, observed: "It is true that the classification of our cities is made on the basis of population, but this term, in this connection, connotes not only the number of the inhabitants, but also municipal magnitude in all respects; and a city largely populous must necessarily have a great stretch of streets and a water-supply of immense volume. It is the largeness of such necessities, incident to a great population, that differentiates cities of the first class from cities of the other classes, and the consequence is that all legislation regulative of such necessities, on account of their magnitude, is obviously constitutional, as it is germane to the basis of municipal classifi-

cation." If, therefore, municipal population, when it is large, does not require a different kind of machinery from that which is suitable to a small population, then it would be plain that the position of the counsel of the relators (that the act was special and local) would be impregnable. The Chief Justice reiterates the same views in *Matheson* v. *Caminade*, 26 *Id.* 4.

In *Warner* v. *Hoagland*, 22 *Vroom* 62, a statute relating to streets, avenues, parks and sewers, in which cities of the first class were excepted, was sustained on the ground that the extent and cost of local improvements necessary to the growth and prosperity of the excepted cities require efficient and expensive city governments, and that the affairs of these municipalities could not be managed by local governments adapted to cities of the population and insulated position of the smaller cities of the state. The same reasoning was adopted by the court in *Randolph* v. *Wood*, 20 *Id.* 85, and also in *Mortland* v. *Christian*, 23 *Id.* 521, 538. The counsel of the plaintiff in error having relied considerably upon the latter case to sustain the present legislation, a statement of the grounds upon which that case was decided will be appropriate. The act then under consideration was one changing the membership and mode of election of the boards of freeholders in counties of the first class. In sustaining the law as not being local and special, the learned judge who delivered the opinion of this court said : "No one familiar with the construction and operation of boards of freeholders in the several counties in this state can fail to see that, by this scheme, an entirely new and distinct system of administrative machinery is provided—one more compact in form, with greater executive possibilities, making greater demands upon the time and services of the members, for which increase pay is provided, together with an increase of individual responsibility, with which is coupled a substantial security to the public by means of bonds with heavy penalties. That such a system is not applicable to the smaller counties is not less evident than that the existence of such machinery would

be an unnecessary and disastrous burden upon their finances. Whether the largest counties do require boards of such increased efficiency is not for us to decide. If they do, it is evidently in respect to matters growing out of excess of population. The legislature, in whom the determination of these questions is vested by the constitution, has decided that counties of the first class do require a change of the character indicated by this act, which changes, from the considerations just mentioned, are inappropriate to the smaller counties for the same reasons which constitute their appropriateness to the larger ones. Such being the relation borne by the provisions of this act to the various counties of this state, viewed from the standpoint of population, the act in question must be deemed to be general, in that it reaches the one class to which the legislature has determined that it is appropriate, and that that class is distinguished by those features which constitute its appropriateness from all the other counties in the state." The act sustained was restricted to counties of the first class. It created boards of freeholders in such counties, with membership, powers, duties and responsibilities different from those pertaining to boards of freeholders in other counties of the state, and changed the time of the election of its members from the spring to the annual election in the fall. The act concerned the machinery by which the affairs of these counties were administered, and the classification was sustained by this court on the ground of the magnitude of the interests which came under the jurisdiction of boards of freeholders in those counties, which made the system of administrative machinery adopted appropriate to such larger counties and inappropriate to the smaller counties in the state. The change in the time for holding the election of these officers, who were county officers, to the election day on which the other county officers were elected, was a mere incident in the scheme of administration provided by the act, which, the classification having been found to be lawful, was, in the judgment of the legislature, necessary, and in fact was eminently appropriate, for the election of the members of

the newly-created boards, who were elected from the assembly districts, and was a matter of discretion on the part of the legislature. This case gives no countenance to the notion that the legislature may classify on the basis of population, and thereupon legislate upon any subject relating to the internal affairs of municipalities untrammeled by the constitutional prescription. The decision gives no support to the act under consideration.

*State* v. *Borough of Clayton,* 24 *Vroom* 277, is not in conflict with the cases above referred to. The act sustained provided a scheme for organizing borough governments. It provided for the incorporation of the inhabitants of any township or part of a township embracing an area not exceeding four square miles and containing a population not exceeding five thousand, whenever, at an election called and conducted in a specified manner, a majority of the electors therein qualified to vote for state and township officers approved of it. In providing for these local governments, population, whatever it may represent or indicate, as well as area, are considerations necessarily entering into the propriety of establishing such local governments, and, as was said by the present Chief Justice, "population does bear a plain and obvious relation to the necessity and propriety of various grades of municipal government." The classification on the basis of population as well as area being necessarily committed to the judgment and discretion of the legislature, the court declared that it would not interfere with the legislative judgment unless the classification be illusive or be applied illusively. The provisions of the act were extended throughout the state and open to be accepted by a popular vote wherever area and population complied with the requirements of the act.

*Paul* v. *Gloucester County,* 21 *Vroom* 586, is a case of similar aspect. An act to regulate the sale of intoxicating and brewed liquors was under examination. The question pertinent to this discussion was whether the classification by population for the purpose of fixing the minimum license fee was vicious.

In that case the legislation in question was under the police power of the state. The evil at which the legislation was aimed was one that concerned individuals, and the regulation of this traffic had prevailed in this state from the earliest period. In the opinion of this court sustaining the law, Mr. Justice Van Syckel said (at *p.* 592): "In administering the license laws the practice has prevailed, under the Inn and Tavern act, to regard the density of population in fixing the license fees. Where the population is dense the legislature may have concluded that the people will be more prosperous; that they will expend their money for luxuries more freely and will pay higher prices than in sparsely-settled districts. Also, that the larger the population the greater will be the expense of maintaining the police department. No more suitable basis of classification, which the legislature could have selected for itself, has suggested itself during my consideration of this subject." Indeed, it may be said with great force that no classification for the purpose of regulating the sale of intoxicating liquors is so eminently appropriate as a classification on the basis of population. Matheson *v.* Caminade is also a similar case. The legislation under examination established in every city of the second class having a population of fifty thousand or over one police court, and provided for the appointment of the judge by the governor, with the advice and consent of the senate. The contention was that cities of this class were not possessed of any quality that would justify the giving to them alone a court of this character. The Chief Justice, in his opinion, declares that this criticism had no force, unless it be assumed that the needs of the smaller cities regarding magistracy were identical with the larger ones. He said: "Such an assumption would of course be absurd, and yet, if it be admitted that places of great population require and are entitled to a more elaborate system of police than places of a sparse population, the fallacy of the position in question is demonstrated, for the legality of a legislative classification for such municipalities has become manifest."

It would need no argument to demonstrate that it is density of population that in a great measure creates the necessity for increased police service. Population in that respect is an appropriate, if not the most appropriate, classification for such legislation. It was with respect to legislation of the character of that involved in State *v.* Borough of Clayton and Matheson *v.* Caminade that Mr. Justice Van Syckel, in Paul *v.* Gloucester City, said (at *p.* 592): "Whether the basis of classification is wise or judicious, or whether it will operate as fairly as some other basis that might be adopted, is a question for the legislature and not for the courts. The extreme limit, of our inquiry in this direction is, Does population bear any reasonable relation to the subject to which the legislature has applied it? Is it germane to the law?"

The act now in hand is not an act establishing a scheme of local government, as was the act in the Clayton case. It is an act regulating the internal affairs of existing municipalities. Nor is it a police regulation in which population is essentially the basis of classification, as in Paul *v.* Gloucester City and Matheson *v.* Caminade. This act stands on considerations extraneous to those in the class of cases above cited. A case more pertinent to the case in hand is *Anderson* v. *Trenton,* 13 *Vroom* 486, 488. In that case a classification on the basis of population in an act authorizing cities having a population of not less than twenty-five thousand to issue municipal bonds was held to be an illusory classification, and the court set aside the act on the ground that it could not see any natural connection between the number of people in a city government and its right to fund a floating debt. The learned judge who delivered the opinion of the court said that it was manifest that "if the classification made by a statute is to be justified or not, by considering whether it is proper to apply the peculiar provisions of the law to the particular individual or individuals designed to be affected, then laws will be upheld or overthrown, not as the courts shall decide them to be general or special, but as they shall deem them wise or unwise. No rule heretofore laid down in this state sanctioned such a

test of constitutionality, nor do I think that such a criterion should be adopted."

It is also apparent from the decisions in the courts of our own state and in other jurisdictions, federal and state, that when a law is in terms local, satisfactory reasons must be found to exclude it from the constitutional interdict. That the cities or municipalities to which it applies have been properly classified for general municipal purposes, does not of itself furnish a sufficient reason for sustaining such legislation. Otherwise the elaborate reasoning in Ex parte Haynes, Mortland v. Christian and similar cases was superfluous. The court should have simply said, "these cities have been legally classified and the legislature may deal with their internal affairs in its discretion."

The principle by which general laws are distinguished from those which are either local or special applies to all legislation regulating the internal affairs of municipalities, and the discretion that enters into the decision of the question whether a particular law is general or local or special is that where the classification appears to rest on substantial grounds and the line of demarcation which separates the places included from those excluded is a matter of judgment, the resolution of the legislature will prevail unless it plainly appears that such classification is an evasion of the constitution.

In the much-canvassed case of Mortland v. Christian similar views were expressed by Mr. Justice Garrison (at pp. 538, 539), who said: "Whether the largest counties do require boards of such increased efficiency is not for us to decide. If they do, it is evidently in respect to matters growing out of excess of population. The legislature, in whom the determination of these questions is vested by the constitution, has decided that counties of the first class do require a change of the character indicated by this act, *which changes, from the considerations just mentioned, are inappropriate to the smaller counties for the same reasons which constitute their appropriateness to the larger ones.* * * * The act in question must be deemed to be general in that it reaches the one class to which the

legislature has determined that it is appropriate, and that *that class is distinguished by those features which constitute its appropriateness from all the other counties in the state.*"

In State *v.* Borough of Clayton the present Chief Justice said (at *pp.* 278, 279): "In determining whether this act is general, within this meaning [that is, whether the class is composed of all municipalities which, considering the purposes of the legislation, are distinguished from others by qualities or characteristics such as to make the legislation appropriate to them and inappropriate to others], its purpose is first to be considered, and it is then to be determined whether the municipalities on which it operates have substantial distinctions segregating them from other municipalities, and evincing that such legislation is germane to them and not to others." In every case the primary consideration in the process of determining whether a particular law, local or special on its face, is a general law in the sense of the constitution is the consideration whether the classification adopted is based on those substantial grounds which justify the limitation of its enactments to one set of municipal bodies and the exclusion of others. No question of legislative discretion can possibly arise until the preliminary question is solved.

It was conceded that the legislation in question is a regulation of the internal affairs of the cities to which it applies, but it was contended that it related to the structure and machinery of government, and therefore classification on the basis of population was legitimate, whether the structure and machinery provided were equally appropriate to other cities or not. It must not be assumed that acts relating to the structure or machinery of municipal government are freed from those rules apt to distinguish general from local and special laws in other cases. The decisions are directly to the contrary. But it is unnecessary to discuss the conditions under which discretion may be said to enter into legislation affecting the structure of municipal government, as exemplified in Matheson *v.* Caminade and McLaughlin *v.* Newark, for the cases cited do not sustain the assertion that this act

relates to either the structure or the machinery of govern-
ment. In State v. Borough of Clayton the act provided for
the organization of local governments with the appropriate
machinery. In McLaughlin v. Newark, 28 Vroom 298, the
act provided the means of dividing cities of the class em-
braced in it into wards and election districts. It dealt, as
was said by the learned justice who delivered the opinion of
the court, only with the structure of the government—the
formation of the machinery by which the affairs of the city
are to be regulated. In Ex parte Haynes the act constituted
municipal boards in certain cities and defined their powers
and duties. The act, as was said by the Chief Justice, dealt
exclusively with the machinery by which the city interests
within their departments were to be regulated. In Owens v.
Furey the act established a municipal board of public works
in certain cities. In Matheson v. Caminade the act established
a police court in cities of the second class and provided for
the manner of the appointment of the magistrates by which
such courts should be held. In these and all the cases in
which statutes based on a classification on the ratio of popu-
lation were sustained, for the reason that they related to the
structure or machinery of municipal government, such legis-
lative acts were directed immediately to the structure of the
municipality itself or to the powers or the machinery of
municipal government.

The act under examination differs in every material respect
from those involved in the preceding cases. It in no sense
affects the machinery, powers or structure of the city govern-
ments, nor does it change the mode of selecting city officers.
The constituency by which those officers are elected remains
the same. The act simply changes the date of their election
by the same constituency and combines the election of munici-
pal officers with the election of state and county officers upon
the same official ballot. It applies only to cities of the first
class—that is, to those having a population exceeding one
hundred thousand. Newark and Jersey City are the only
cities of this state with a population above the limit men-

tioned in the act, the population of Newark being, by the census of 1895, two hundred and fifteen thousand eight hundred and six, and Jersey City, one hundred and eighty-two thousand seven hundred and thirteen. Among the cities with a population not exceeding one hundred thousand are Paterson, with a population of ninety-seven thousand three hundred and forty-four; Camden, with a population of sixty-three thousand four hundred and sixty-seven; Trenton, sixty-two thousand five hundred and eighteen; Hoboken, fifty-four thousand and eighty-three, and Elizabeth, forty-three thousand eight hundred and thirty-four.

From the earliest period in the history of this state it has been the policy to keep the election of township, town and city officers separate from the election of state and county officers. This policy is forcibly expressed in an act of the legislature passed in 1889 (*Gen. Stat., p.* 1331), which in its preamble recited, "Whereas, it is deemed for the best interest of municipal government that elections for local officers should not be held on general election days," and enacted "that no local or charter election shall be held in this state on the same day fixed for the holding of a general election or on the day when members of the general assembly are now elected by law." At the time this act was passed no one of the cities, towns, boroughs or townships had its local election coincident with the state and county elections. The act changes the day for municipal elections in the two cities and combines the election for local officers with the election for state and county officers. The issue presented by this record is whether, having regard to the subject-matter of this legislation, cities having a population exceeding one hundred thousand have, by reason of population, characteristics distinguishing them from cities with a population of less than one hundred thousand which would make such legislation appropriate to the former class of cities and inappropriate to cities having a less population. In solving this issue it must be borne in mind that this act, as already observed, in no sense relates either to the machinery or the powers or the structure of city government. On what

course of reasoning can substantial grounds be found for discriminating between the cities of the one class and other cities, towns, townships and localities in the matter of holding local elections at the same time and combined with elections for state and county officers? What characteristics are inherent in the population or affairs of the two cities embraced in the act distinguishing them from other cities—Hoboken, Paterson, Elizabeth, Trenton and Camden, cities of large population—which render an election for local officers, combined with an election for county and state officers, appropriate to the one class and inappropriate to the other, of such magnitude and importance as will justify the inclusion of the one class and the exclusion of the other from this scheme of legislation? The act being local on its face, just grounds for such discrimination must be found in its subject-matter to relieve it from the constitutional interdict.

In the Supreme Court the grounds assigned for such a discrimination appear, briefly, to have been the double expense, the lack of interest on the part of voters and consequent negligence in the choice of candidates, and in safeguards against election frauds, such as bribery, fraud and corruption. Under the latter head it was argued that offices in large cities being more lucrative the temptation to election frauds is greater, calling for more elaborate and expensive safeguards than are applicable to charter and municipal elections elsewhere. It will be observed that by the act of February 19th, 1896 (*Pamph. L., p.* 13), it is provided that in every city of this state having a population exceeding forty thousand, the charter election and all elections for municipal officers should be held and conducted as the elections for members of the general assembly were held and conducted at the last election preceding the time of holding such charter election or election for municipal officers. If the stringent election laws which apply to the fall elections are necessary to suppress frauds in the conduct of elections, such laws are in force in Paterson, Camden, Trenton, Hoboken and Elizabeth, cities having a population in excess of forty thousand, and these cities are ex-

.cluded from the legislation under review. And as covering the whole of this subject, if any advantages are to be gained or evils prevented by combining elections for city officers with state elections, can any reasonable ground be assigned for conferring such benefits upon Jersey City which should not be conferred upon Hoboken in the same county, or granted to Newark and denied to Paterson, Camden, Trenton, Elizabeth and, I may add, other cities in the state?

With respect to the other reasons assigned as grounds for the discrimination created by this act, such as the expense of separate elections, lack of interest in voters and election frauds, these evils exist in a comparative degree in all the cities of this state, and if the combination of municipal and state elections will cure these evils, other cities cannot lawfully be excluded from this curative process. The reasoning of the justices of the Supreme Court on these subjects is so satisfactory that elaboration is unnecessary. Indeed, I may say that the counsel who argued this case in this court for the plaintiff in error, by his brief, seems to have repudiated the existence of any grounds to justify this classification by that process of reasoning. His argument for reversing the judgment below rests mainly, if not wholly, upon the contention that this legislation relates to the structure and machinery of local government—an argument which, to me, seems unfounded.

Being of opinion that this act is an act regulating the internal affairs of cities based upon an insufficient classification, and therefore in violation of the constitutional prescription, I shall vote to affirm the decision of the Supreme Court.

DIXON, J. (dissenting). My conclusion that the statute under review in this case is constitutional rests upon four legal propositions which are, I think, fully supported by the decisions in this state:

*First.* Our earliest cases involving the effect of the constitutional amendment forbidding the passage of private, local and special laws to regulate the internal affairs of towns and

counties, lay down the principle that a law is general, and so not prohibited, if it applies to a class of towns, provided the class is formed upon a basis which bears some reasonable relation to the object of the law. *Van Riper* v. *Parsons*, 11 *Vroom* 1; *Hammer* v. *Richards*, 15 *Id.* 667.

*Second.* Later cases decide that towns may constitutionally be classified upon the basis of their population, for the purpose of legislation, whenever there exists a reasonable relation between population and the object of the law. *Randolph* v. *Wood*, 20 *Vroom* 85; *S. C. on error*, 21 *Id.* 175.

*Third.* Contemporaneously with the announcement of the foregoing rule, it was declared that whenever population may constitutionally be made the basis of classification, the line of demarcation can be drawn in the discretion of the legislature, provided it be not drawn illusively—that is, "with a view of escaping the constitutional restriction," as Chief Justice Beasley expressed it in *Van Riper* v. *Parsons*, 11 *Vroom* 9. *Randolph* v. *Wood*, 20 *Id.* 85, 91; *Paul* v. *Gloucester County*, 21 *Id.* 585, 592; *Warner* v. *Hoagland*, 22 *Id.* 62, 68; *Mortland* v. *Christian*, 23 *Id.* 521, 538; *Matheson* v. *Caminade*, 26 *Id.* 4.

Manifestly the rule last mentioned is but a corollary from the previous decisions, for, place the line of cleavage where you will, and let the reason for discriminating between the smallest member of the lower class and the largest member of the higher class be ever so strong, that reason will approach the vanishing point when you compare the largest member of the lower class with the smallest member of the higher class; consequently, between these the line must be drawn arbitrarily or nearly so, and this arbitrary power must rest with the legislature, subject to the proviso stated.

*Fourth.* Our more recent decisions have, in some cases, expressly declared, and in others assumed, that there exists a reasonable relation between the population of towns and their "structural forms of government and administration—the structure of the municipal government, the formation of the machinery by which their local affairs are to be regulated."

This proposition is sustained by the uniform practice of civilized nations, for everywhere the systems of municipal government provided for large communities differ from those adopted for small ones. Our courts have relied upon it to support many statutes dealing with a great variety of municipal concerns. *Mortland* v. *Christian,* 23 *Vroom* 521 ; *In re Haynes,* 25 *Id.* 6, 28 ; *Lewis* v. *Moore, Id.* 121 ; *In re Sewer Assessment for Passaic, Id.* 156 ; *Owens* v. *Fury,* 26 *Id.* 1 ; *Matheson* v. *Caminade, Id.* 4 ; *Baker* v. *Delaney, Id.* 9 ; *Oler* v. *Ridgeway, Id.* 10 ; *McLean* v. *Gibson, Id.* 11 ; *Calvo* v. *Westcott, Id.* 78 ; *McLaughlin* v. *Newark,* 28 *Id.* 298 ; *S. C. on error,* 29 *Id.* 202 ; *Johnson* v. *Asbury Park, Id.* 604.

The propositions thus established embody this rule applicable to the present case : that a law will be general although it embraces only a class of cities formed on the basis of their population according to the discretion of the legislature, provided the law deals merely with the structure or machinery of municipal government, and provided the class does not appear to have been formed illusively.

It remains to consider whether the statute now in hand comes within these two provisos. Its purport is to change the day for holding the municipal elections in cities of the first class—that is, in cities having a population exceeding one hundred thousand.

That the municipal elections form part of the machinery of the local government is too plain to be elucidated by anything beyond the statement of it. It seems equally evident that the body possessing the general legislative power to authorize or prohibit such elections possesses also, as an incident, the power to set the times for holding them, and unless there be express constitutional provision to the contrary, this incidental power must be as untrammeled as the principal. No such provision exists in New Jersey. I am quite unable to perceive why, if the legislature can prescribe or abolish municipal elections in a designated class of cities, without regard to the existence of such elections in other cities, and in

its absolute discretion, it cannot also, with like freedom of judgment, fix the day for holding them.

The last matter for consideration is whether the line of demarcation between cities of the first class and other cities, which this statute adopts, is an illusive one—one " contrived with a view of escaping the constitutional restriction." . That it is not is established by several reasons—first, it was originally drawn as part of a general classification of all the cities of the state soon after the adoption of this constitutional amendment, and with the sole purpose, I believe, of furnishing a rational basis for constitutional statutes adapted to the diverse needs of our very dissimilar municipalities; second, when drawn it was in recognition of a very wide gap between the cities upon one side of it and those upon the other, and although some cities then far below it have now nearly reached it, that must happen with any permanent limit and cannot render it illusory; and third, every branch of government has for many years and in numerous instances acted upon it as an honest and reasonable division, unquestioned in this particular until the present controversy arose.

I must therefore consider this statute as one dealing with a class of cities formed by the legislature in the exercise of its constitutional discretion, upon a basis reasonably related to the object of the law, and therefore must vote to reverse the judgment of the Supreme Court.

COLLINS, J. (dissenting). I base my dissent from the conclusion reached in this cause upon three fundamental rules evolved from the long discussion of the constitutional power of the legislature to classify towns when regulating their internal affairs by law.

*First.* For legislation dealing only with the structure of municipal government—the formation of the machinery by which municipal affairs are to be regulated—the municipalities of the state may be distributed into classes constituted on the basis of population.

This rule was thus formulated in the Supreme Court in the case of *McLaughlin* v. *Newark*, 28 *Vroom* 298, 299, and was

approved by this court in its affirmance of the judgment therein. *S. C.,* 29 *Id.* 202.

The rule is now conceded, but its applicableness in this case is questioned. It is doubted that a statute the only purpose, or the chief purpose, of which is to change the date of municipal elections deals at all with the structure or machinery of municipal government. I have no such doubt. It seems self-evident that such a statute deals directly and solely therewith.

Incumbency of office has the same place in the structure and machinery of municipal government that heart-action has in an animal mechanism. Without it there can be no living organization. Elections and appointments to office are correlative. Most of the judicial decisions leading to the establishment of the rule above stated turn upon statutes providing for change from one to the other of these methods of filling municipal office. In *Warner* v. *Hoagland,* 22 *Vroom* 62, the law sustained transferred from boards of commissioners to the common council important powers of government in all cities except those of the first class. The law sustained in *In re Haynes,* 25 *Id.* 6, took from various boards elected by the people and placed in one board to be appointed by the mayor all the powers over public works in cities of the first class. A later law, never questioned, made that board elective. *Pamph. L.* 1894, *p.* 524. *Owens* v. *Fury,* 26 *Vroom* 1, and other cases decided at the same term with that case, sustained, for other cities of a class based upon population, laws transferring from elective to appointive boards and officers various governmental powers. Surely, then, in judicial opinion, elections to municipal offices enter into the structure and machinery of municipal government. The fixing of a date for such elections is, of course, a necessity.

In *Mortland* v. *Christian,* 23 *Vroom* 521, this court adjudged that local elections are subject to legislative change on the basis of population, and did so on the express ground that the act then under review concerned the machinery of administration. *S. C., Id.* 537. It is now observed that the change

of date there sustained was a mere incident in the scheme of administration provided by the act, and the inference seems to be that, standing alone, a change would not have been upheld. I cannot think that such an inference was intended or that this court means to declare that, had the act left unchanged the date of election, a new date might not have been fixed by a separate act. There have been several such separate acts extant. In 1895 (*Gen. Stat.*, p. 515) it was enacted, in a statute dealing with no other subject, that in all cities of the second class the annual or charter elections should be held on the second Tuesday of April, and in 1896 (*Pamph. L.*, p. 169) it was enacted that the municipal or charter elections in cities of the first class should be held on the second Tuesday of April. It is this last-named act alone that justifies the change of Newark's charter election from autumn to spring, the former act (*Pamph. L.* 1892, p. 21) being plainly unconstitutional Can it be that, under the decision now rendered, Newark must return to October elections? It was very justly said by the present Chief Justice, in the case of *State* v. *Borough of Clayton*, 24 *Vroom* 277, 281, that while the legislature may, in obedience to the constitutional requirement, pass a general law providing for a complete system of government for all municipalities, or for appropriate classes thereof, it is clear that it may also pass a series of co-related acts having the same purpose. I must assume that an act like that now overthrown would have been sustained had it fixed some other day for municipal elections than that already set apart by law for state and county elections. If so it would have been so sustained by force of the rule I have stated, for on nothing else can it rest.

But it is argued that in applying the rule the court must look at every act dealing with the structure or machinery of municipal government to see if population bears relation to its particular subject. This would lead to a paradox destructive of the rule. The courts have adjudged that population bears a reasonable relation to the structure and machinery of municipal government. This becomes meaningless if we

say instead that population bears a reasonable relation to so much of the structure and machinery of municipal government as bears a reasonable relation to population. I find no support in the adjudged cases for the suggested limitation. The formative judicial opinion out of which the rule was finally evolved is only useful as showing the continuous progression that led to that result. For example, in the Haynes case, relied on as an instance of this limitation, Chief Justice Beasley, in vindicating a statute by which in cities of the first class the legal machinery for controlling streets and water-supplies was regulated (25 *Vroom* 6), did indeed confine himself to showing the relation of those interests to population. He needed to go no farther, but in the later case of *Matheson* v. *Caminade*, 26 *Vroom* 4, 6, he uses language in which I find no hint of limitation. There he says: "It has been decided that, with regard to structural forms of government and administration, the municipalities of the state may be distributed, for legislative action, into classes constructed on the basis of population. The ground plainly expressed, for this conclusion was that population in this connection is a connotative term, signifying not only the populousness of a city, but, as well, the magnitude of its public concerns, and hence a fair classification on such basis was a distribution of cities which, in all essentials, were of different grades, manifestly requiring different forms of government, and hence the choice of adaptive forms of government was of necessity a legislative function."

This is the only safe and sure rule. I trust the decision of the present cause has not overthrown it.

*Second.* When the drawing of some line of demarcation between the larger and the smaller aggregations of people is justified, it is for the legislature to say where that line shall be placed.

I quote this rule from the opinion of the Supreme Court in the case of *Randolph* v. *Wood*, 20 *Vroom* 85, 91. This court approved it when affirming judgment in that case (21 *Vroom* 175), and it is not questioned now. Of course any classifica-

tion, to be valid, must be not illusive or evasive.  The "first class" of the general act has been too often sustained by this court to be now challenged as an evasion of the constitution. I do not see the force of the observations made upon that subject in the course of the prevailing opinion in this cause.

*Third.*  Legislation appropriate to a proper class of municipalities is valid, though not extended to other classes to which it may be equally appropriate.

This rule results from the reasoning and decisions in several cases, among them *State* v. *Borough of Clayton, supra,* followed and approved by this court in *Road Commission* v. *Harrington Township,* 26 *Vroom* 327.

No one has stated this rule more clearly and comprehensively than the learned judge who speaks for this court in the present case.  In the case of *Johnson* v. *Asbury Park,* 29 *Vroom* 604, he says (at *pp.* 607, 608): "An examination of the many statutes relating to cities *of the several classes,* towns, townships and boroughs will disclose diversities in the power granted to these several municipal bodies which, if tried by the criterion proposed by counsel in this case, viz., that no reason can be given for granting certain special powers to one class of municipalities and withholding them from other classes, would operate disastrously upon the system of municipal government in force in this state.  The division of municipalities into cities, towns, townships and boroughs being a classification permitted by the constitution for the purpose of local government, the powers to be conferred upon these bodies severally which pertain to the ordinary functions of local government must rest in legislative discretion."

The same reasoning applies, of course, to statutes that relate to the structure and machinery of municipal government.

If, therefore, the act now impugned is invalid, it must be so because of some vice *sui generis.*  Such a vice is said to inhere in the combination of municipal with general elections.  This is the stress of the opinions of the Supreme Court in *Hoos* v. *O'Donnell, ante p.* 35, and of this court in the present case approving that decision.  The claim must be

thus stated, viz., that in regulating by means of elections the formation of local government in a proper class of municipalities constituted on the basis of population, the legislature has not the constitutional power to fix for such elections a date already set apart by law for state and county elections or (by implication) for national elections, and to prescribe the use of a single ballot.

I had supposed the opposite of this proposition to be involved in *Mortland* v. *Christian, supra.* There a statute was upheld as constitutional which reorganized, in counties of a class based on population, their boards of chosen freeholders by substituting for a membership elected in the spring from townships and city wards one to be elected from assembly districts in November at the general election. True, the point was not specially ruled and perhaps was not fully presented by counsel, still it was of necessity involved in the case and it would seem that a resolution against it must subsist in the judgment.

Taking up the question as *res nova,* I cannot assent to the proposition. I see for it no basis whatever. In this court it is said that it has always been the policy of this state to keep the election of township, town and city officers separate from the election of state and county officers. This is a mistake. There have been previous instances of combining municipal with general elections. They were combined in Newark in 1851 (*Pamph. L., p.* 233, § 4), in Atlantic City in 1854 (*Pamph. L., p.* 280, § 4), and in Elizabeth in 1867 (*Pamph. L., p.* 333, § 2). In the last-named city the combination prevailed until the act of 1889. The legislature of 1889 did declare its policy, but the legislature of 1897, as to cities of the first class, adopted a different one by law, and the courts cannot review its judgment.

It should be noted that an incidental combination, as in the law upheld in *Mortland* v. *Christian, supra,* would be as much against the supposed policy invoked as separate legislation would be. I cannot distinguish the cases. Furthermore,

the same reasoning would avoid statutes framed to include all towns as well as those limited to a class.

Whatever may be thought as to the wisdom or unwisdom of combining municipal with general elections, the subject is one of legislative policy and entirely within legislative control. The people have declared no such policy in the constitution.

In the Supreme Court, in Hoos *v.* O'Donnell, the case was rested by one of the judges upon a proposition not adopted in the prevailing opinion in this court in the present case but deserving of attention. That proposition is that the act overthrown infringes the implied constitutional restriction that all regulations of the elective franchise must be uniform and impartial. But this restriction has reference to such a right of suffrage as is guaranteed by a constitution or inherent in government by the people, and does not preclude local or special laws. For example, registry laws for large cities only have, in this state, existed unchallenged for more than twenty-five years, and I have no doubt that many of the other regulations now general would be unassailable, even if limited in operation.

But a sufficient answer to the objection is found in the fact that the restriction appealed to does not include municipal elections. There is in this state no constitutional right in the people to elect municipal officers. The legislature, in its control of municipal corporations, is limited only by various requirements that laws shall be general. If it is seen fit to adopt the method of popular elections in administering these governmental agencies and the requirements of generality are met by a proper classification, the voter cannot complain that his vote in that behalf is called for in some localities at the time of exercise of his general right of suffrage and in others at a different time.

The doctrine that voters at municipal elections cannot constitutionally be subjected to or protected from the influence of state or national politics unless all municipalities, or at least all of the same type, are included in every law that may have

such an effect, will, if logically carried out, lead to startling results. The legislature, if it change the date of the general election, must avoid the date of local elections in every municipality in the state. It cannot, by classifying counties, yield to the powerful argument now current, that in populous communities local should be separated from general elections, for counties as well as towns come within the constitutional prohibition. When providing for local elections in classes of towns or counties otherwise permissible, it must conform to the will of the federal congress, for, under the constitution of the United States (article 1, section 4), the right to fix the time of election of members of the house of representatives rests in the national legislature and has been exercised. *U. S. Rev. Stat.* § 25. I cannot assent to a doctrine that of necessity leads to such results.

I find nothing in the opinions of the Supreme Court or of this court to convince me that the act of March 18th, 1897, is unconstitutional. It is unnecessary to discuss the other objections urged by counsel. It is sufficient to say that I find them all untenable and vote for reversal.

There is a suggestion in the opinion delivered for this court to which I think the court does not mean to stand committed, and that is, that when a law is seen on its face to operate only in specified localities, it is to be deemed to be local or special until the contrary is shown. The presumption should be the other way, for every intendment is in favor of the constitutionality of legislation. *Cooley Const. Lim.* \*182.

*For affirmance*—The Chief Justice, Depue, Lippincott, Van Syckel, Adams, Bogert, Hendrickson, Nixon. 8.

*For reversal*—Collins, Dixon, Ludlow. 3.